**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| PAULINA GUIROLA DE DAVID, et al, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Case No. 10-CV-03502 |
| ALARON TRADING CORPORATION d/b/a ) | Judge Robert W. Gettleman |
| ALARON LATIN AMERICA, et al , ) | Magistrate Judge Denlow |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ALARON TRADING CORPORATION, ) | |
| ) | |
| Third-Party Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| GEORGE DE MARCILLA ) | |
| ) | |
| Third-Party Defendant. ) | |

**MEMORANDUM IN SUPPORT OF ALARON TRADING COPORATION'S MOTION TO DISQUALIFY J. B. GROSSMAN AS ATTORNEY FOR PALINTIFFS**

Defendant Alaron Trading Corporation d/b/a Alaron Latin America ("Alaron"), by and through its undersigned attorney, and for its Memorandum in Support of Motion to Disqualify J.B. Grossman ("Grossman") as Attorney for the Plaintiffs, states as follows.

**I.**

**INTRODUCTION**

The Second Amended Complaint ("SAC") alleges claims by eighteen persons and entities against Alaron for the alleged fraudulent activity of Mercados de Futuros

("MDF") and its owner, one Raul Alfonso Girón Galvez ("Girón") in soliciting and trading their commodity futures trading accounts. The gist of these claims are that, MDF and Girón, aided and abetted by employees in Alaron's Miami Branch Office, misrepresented Girón's trading acumen, churned the Plaintiffs' accounts, fraudulently concealed losses, and misrepresented the returns and interest rates that were supposedly guaranteed. The relevant time period, as alleged in the SAC, are the years 2005-2008, inclusive. A centerpiece of the allegations against Alaron is a July 18, 2005 letter authored by one of the managers in the Miami Branch office, George de Marcilla ("de Marcilla"), a copy of which is attached as Exhibit "C" to the Motion to Disqualify. In its Third-Party Complaint, Alaron has alleged that de Marcilla signed the July 18, 2005 letter without authority and is seeking indemnity from de Marcilla for any damages awarded to the Plaintiff against Alaron.

## II.

## STATEMENT OF FACTS

At all relevant times, Alaron was a futures commission merchant ("FCM") located in Chicago that operated a Miami Branch Office known as Alaron Latin America ("ALA"). In addition to de Marcilla, Defendant Alberto Alvarez ("Alvarez") was also a branch manager of ALA. As a branch manager of ALA, Alvarez had the authority to retain legal counsel for ALA. *See* Affidavit of Steven A. Greenberg attached as Exhibit "A" to the Motion to Disqualify.

According to de Marcilla, who was deposed on December 26, 2011,[1] he became concerned over certain representations that MDF and Girón. As de Marcilla testified:

---

[1] The deposition was not concluded and has been continued for a date not yet determined.

> Well, since the beginning of the relationship, I had some concerns about them guarantying interest and principal, in particular because it was, in my judgment, a violation of the contract.
>
> Since Mr. Alvarez did not want me to go to the Compliance Director and get clearance on that, as time went on, the business of MDF kept growing. And at the end of every month a number of checks were coming in, were being sent, very burdensome. And I was concerned with the no jurisdiction provision.
>
> So I asked Alvarez, you know, about it. And he says, you know, ask -- get an attorney to look into the Martinez. . And so I called JB.[2]

Dep. at p. 207. De Marcilla described how he then contacted Grossman in January of 2006 (Dep. at pp. 84-5) as follows:

> And I asked JB. And *I told JB in principal about the IB and about the fact that MDF was guarantying interest and principal in Guatemala, and that I had my concerns that we could be in violation of the rules and regs*, that I had talked to the NFA and the CFTC and Albert all said no jurisdiction, but I felt uncomfortable (sic) *And I had talked to Albert about possibly retaining counsel*.
>
> *JB's response to me at the time was that it was -- my recollection is that he said that jurisdiction or no jurisdiction, it was a very gray line.* And he suggests that we retain him in order to contact the CFTC and the NFA without revealing the name of the foreign IB -- the FCM. Excuse me, and get clearance that there would be no problem simply because they were foreign investors, foreign IBs.

Dep. at pp. 207-08 (emphasis supplied). The guarantying of principle and a rate of return, *i.e.* interest, is a continuing refrain repeated throughout the SAC. See e.g. SAC at ¶¶ 2, 3, 4, 5, 8, 11, 13, 14, 30, and 31

De Marcilla further testified:

> Q. And what did you tell Mr. Grossman was the reason for your meeting?
> A. *I told him about the case. I told him about that I had some questions about whether quote/unquote the jurisdiction issue held or not. I did not want to find myself involved in a lawsuit.* I did not want to find myself involved in any kind of a problem where we were doing a

---

[2] De Marcilla testified that Martinez was Girón's partner. Dep. at p. 183.

3

transaction that was, in my judgment, against NFA and CFTC rules and simply because of a quote/unquote no jurisdiction factor should have been allowed. Okay? End of comment.

 Q. *Did you explain to Mr. Grossman that you had this discussion internally, and that your superior, Mr. Alvarez, the head of the operation, authorized you to contact him to discuss this?*
 A. *Yes.*
 Q. *So in your understanding that Mr. Grossman understood that the purpose of this exchange was Alaron's business and the question of whether or not Alaron had any exposure, liability or otherwise?*
 A. *I would assume that would be understood, yes.*
 Q. All right. You then indicated you basically told him about the case. I won't ask you to go into those details. But it involved, among other things, *Alaron's possible involvement in activities that might run a foul of United States laws*?
 A. *Correct.*

Dep. at p. 212-13 (emphasis supplied). De Marcilla also testified:

 Q. . . .*Your purpose in contacting Mr. Grossman was to discuss the business of the Alaron Miami branch*?
 A. *Yes, sir.*
 Q. And you believe Mr. Grossman understood that.
 A. Yes, sir.
 Q. Well, I mean, was that, in fact, the case, that you were talking with Mr. Alvarez, and Mr. Alvarez said go get a lawyer?
 A. I didn't see it as on behalf of Alaron. I saw it on behalf of the branch, that we were not -- since I wasn't able to talk to Compliance, I didn't want -- I wanted some assurance that this was not a problem.
 Q. *Thereafter you disclosed details about the*
 A. *Yes, sir.*
 Q. And he said okay, I'm happy to talk to you about that?
 A. Correct.

Dep. at pp. 215-16 (emphasis supplied). And, as de Marcilla further testified:

 Q. Okay. But at that meeting you did disclose to him the issues about MDF possibly guarantying –
 A. Yes.
 Q. -- interest and principal?
 A. Yes, I did.
 Q. You expressed the disagreement within the branch about the legalities of that?
 A. I did.
 Q. *Essentially you provided him with an overview of what has now*

> *become this litigation; is that fair?*
> A. *That's correct.*

Dep. at p. 218 (emphasis supplied).

Concerning his relationship with Grossman, de Marcilla testified that Grossman formed the following entities for him: Cattleman's Hedgers Group, Cattleman's Energy, Cattleman,s Asset Management, and Cattleman's FX. Dep at pp. 94-5. Grossman served as counsel and registered agent for those companies owned by de Marcilla. Dep. at p. 95. Grossman's representation of de Marcilla began in 2007 (Dep. at p. 8) and terminated in 2009. Dep. at p. 9. The following is a description of the type of legal services Grossman provided de Marcilla:

> He wrote all of the corporate legal work of that corporation, and he prepared for me (sic) my subordinated loan agreements for the investors, lended money in order to do Cattlemen's Hedgers Group.

.
Dep. at p. 8.

De Marcilla subsequently provided an affidavit to Grossman on May 29, 2008 (Dep. at p. 55) prior to the filing of the case. *See* Exhibit "D" to the Motion to Disqualify. As de Marcilla testified, Grossman failed to counsel him on the possible ramifications of providing such an affidavit.

> Q. All right. And, likewise, Mr. Grossman never advised you of the possible legal implications of your providing that testimony?
> A. No, he did not. In fact, he told me that by providing the testimony, that it would be very unlikely that Alaron would involve me if I was a material witness.

Dep. at p. 86-7. Furthermore, when de Marcilla inquired as to whether his July 18, 2005 letter was the basis for the lawsuit, Grossman, apparently aware of the conflict, falsely

5

told him "that the letter was not mentioned … in the complaint." Dep. at p. 88.[3]

As de Marcilla further testified, referring to his meeting with Grossman on behalf of Alaron in January of 2006:

> Q. Was that a concern of yours when you were asked by Mr. Grossman to provide what has now become the affidavit in this case?
> A. Yes, it was.
> Q. What did Mr. Grossman tell you in response to your expression of concern?
> A. His response was that I should state my story of what happened in that office and how this business came about as he knew from very early in the case that I have not -- that I didn't like this business. And I talked to him sometime early January of 2006 on the matter concerning whether there could be a potential problem with the fact that foreign IB was guaranteeing principal and interest, and whether the quote/unquote no jurisdiction, in fact, was basically an exception to what I felt was a violation of NFA law.

.
Dep. at pp. 84-5.

### III.

### ARGUMENT

#### A.
**Violation of Rule 4-1.18 Of The Florida Code of Professional Conduct**

Rule 4-1.18 of the Florida Code of Professional Conduct applies to communications with prospective clients and states as follows:

> **RULE 4-1.18 DUTIES TO PROSPECTIVE CLIENT**
>
> **(a) Prospective Client.** A person who discusses with a lawyer the possibility of forming a client-lawyer relationship with respect to a matter is a prospective client.
>
> **(b) Confidentiality of Information.** Even when no client-lawyer

---

[3] This letter attached as Exhibit "C" to the Motion to Disqualify was produced by Plaintiff de David who has alleged as follows:
> At each of these meetings, the speakers stressed the close relationship and mutual support between Defendant Alaron and MDF and that an investment with them was a good and safe one. *Plaintiff Guirola de David had received a July 18, 2005 letter from Defendant Alaron stating the same.*

SAC at ¶ 1 on page 4 (emphasis supplied).

relationship ensues, a lawyer who has had discussions with a prospective client shall not use or reveal information learned in the consultation, except as rule 4-1.9 would permit with respect to information of a former client.

**(c) Subsequent Representation.** A lawyer subject to subdivision (b) shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be used to the disadvantage of that person in the matter, except as provided in subdivision (d). If a lawyer is disqualified from representation under this rule, no lawyer in a firm with which that lawyer is associated may knowingly undertake or continue representation in such a matter, except as provided in subdivision (d).

**(d) Permissible Representation.** When the lawyer has received disqualifying information as defined in subdivision (c), representation is permissible if:

(1) both the affected client and the prospective client have given informed consent, confirmed in writing; or

(2) the lawyer who received the information took reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary to determine whether to represent the prospective client; and

(i) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom; and

(ii) written notice is promptly given to the prospective client.

This rule comports with established Florida law. *See e.g.* Dean v. Dean, 607 So.2d 494 (Fla.App. 4 Dist. 1992) *rev. dis*. 618 So.2d 208 (1993); Jackson v. Bellsouth Telecommunications, 372 F.3d 1250 (11th Cir. 2004).

When de Marcilla consulted with Grossman in January 2006 on behalf of Alaron, Alaron became a "prospective client" within the meaning of Rule 4-18.1. This rule, and Alaron's status as a prospective client entitle Alaron to assert the attorney/client privilege on matters discussed with Grossman. Therefore, since the sole purpose of de Marcilla's meeting with Grossman was to obtain legal advice for Alaron, all matters discussed in

7

that meeting became subject to the attorney/client privilege between Alaron and Grossman.

As stated in the comments to Rule 1.18:

It is often necessary for a prospective client to reveal information to the lawyer during an initial consultation prior to the decision about formation of a client-lawyer relationship. The lawyer often must learn such information to determine whether there is a conflict of interest with an existing client and whether the matter is one that the lawyer is willing to undertake. *Subdivision (b) prohibits the lawyer from using or revealing that information, except as permitted by rule 4-1.9, even if the client or lawyer decides not to proceed with the representation. The duty exists regardless of how brief the initial conference may be.*

933 So.2d 459-60 (2006) (emphasis supplied). Rule 4-1.9 states

A lawyer who has formerly represented a client in a matter shall *not* thereafter:

(a) *represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent*; or
(b) use information relating to the representation to the disadvantage of the former client except as rule 4-1.6 would permit with respect to a client or when the information has become generally known.

933 So.2d at 445 (2006) (emphasis supplied). Clearly, the existence of both the Plaintiffs and their possible claims against Alaron became know to Grossman as a result of the attorney/client conversation with de Marcilla in January of 2006. And, as discussed *infra*, the use of the information obtained from de Marcilla against Alaron also violates Rule 4.1-7 of the Florida code of Professional Conduct

Since Alaron did not provide any consent, informed or otherwise, Grossman cannot ethically represent the Plaintiffs and must withdraw from their representation. If he refuses to voluntarily do so, the Court must remove him as Plaintiffs' counsel.

8

**B.
Violation of Rule 4-1.7 Of The Florida Code of Professional Conduct**

After the January 2006 consultation with Grossman where de Marcilla discussed his concerns, not only for Alaron but for his own possible liability, regarding the business being introduced by MDF, de Marcilla proceeded to retain Grossman for his personal business. That representation began in 2007 and ended sometime in 2009, the same year in which de Marcilla signed the affidavit for Grossman that has been used in this litigation that is attached as Exhibit "D" to the Motion to Disqualify.

Specifically, in 2009, de Marcilla discussed with Grossman his possible liability for having sent the July 18, 2005 letter to prospective MDF clients. Grossman responded to de Marcilla's concern whether providing the affidavit could expose him to liability (*i.e.* a suit by Alaron), Grossman told de Marcilla that it would not. Dep. at p. 86-7. Worse, when de Marcilla asked Grossman whether his July 18, 2005 letter was involved in the lawsuit, Grossman told him that it was not despite the explicit allegation contained in ¶ 1 at p.4 of the SAC. Furthermore, the July 18, 2005 letter also is being used in support of the repeated refrain by Plaintiffs that Alaron touted Girón as a top trader in Latin America and that MDF and Alaron had a "close relationship." As Plaintiff de David has alleged:

> At each of these meetings, the speakers stressed the close relationship and mutual support between Defendant Alaron and MDF and that an investment with them was a good and safe one. *Plaintiff Guirola de David had received a July 18, 2005 letter from Defendant Alaron stating the same*.

¶ 1 (p. 4) of the SAC (emphasis supplied). The letter is also being used to support the following allegation:

> As part of the strategy to solicit and induce prospective Latin American

9

> investors, including Plaintiffs, to open accounts with Alaron, MDF and Defendants embarked upon *a joint marketing effort*.

SAC at ¶ 34 (emphasis supplied).

And now, the July 18, 2005 authored by de Marcilla, is the centerpiece of

Alaron's Third-Party Complaint against de Marcilla:

> 26. Despite de Marcilla's belief that MDF and Girón were violating the law, de Marcilla (who has stated the he was promised a commission override by Alvarez for business generated out of the Miami Branch Office that included MDF), authored and signed a promotional letter (hereinafter "the July 18, 2005 letter") on Alaron letterhead for the use of MDF and Girón. The letter, addressed "To Whom It May Concern," stated:
>> We wish to let you know that Mercado de Futuros S.A. has been a remarkable client of Alaron Trading Latin America.
>>
>> His leadership in the Futures Industry in Guatemala and El Salvador is a major accomplishment. He has put together a team of professional brokers with an impressive background in the field of marketing futures products. In this regard, MDF proves to be one of the best in their field. He is also quite active in educating the public in the delicate art of trading futures and options on futures through a series of professional trading seminars at the University level. For more information feel free to contact me.
>
> *See* Exhibit "B" hereto.
> 27. Since the letter was not addressed "Dear Customer" but instead was addressed "To whom It May Concern," the letter was intended by de Marcilla to be used by MDF and Girón as promotional material to solicit customers for MDF.
> 28. At all times relevant hereto, Alaron required that all correspondence and promotional material be approved by Alaron's compliance department and by an Alaron principal.
> 29. Third-Party Defendant de Marcilla, as an NFA registered branch office manager of Alaron, was aware of this requirement. However, de Marcilla, in complete derogation of his responsibilities as a branch office manager and of his fiduciary obligations to Alaron, willfully concealed the July 18, 2005 letter from Alaron and never sought the required approvals.
> 30. Had de Marcilla followed Alaron's procedure and sought approval from Alaron, no approval would have been given.
> 31. MDF and Girón did, in fact, use the letter authored by de Marcilla

>as marketing material to solicit customers. See Exhibit "C" hereto that is incorporated by reference herein.
>
>32. The July 18, 2005 letter authored by de Marcilla is, in fact, the July 18, 2005 letter that Plaintiff Guirola de David alleges in paragraph 6 of the Amended Complaint that she received and which she states "stressed the close relationship and mutual support between Defendant Alaron and MDF and that an investment with them was a good and safe one." *Id*. Other of the Plaintiffs also received the July 18, 2005 letter from MDF.

Third-Party Complaint at ¶¶ 26-32.

Therefore, the more Grossman uses the letter to attempt to show that Alaron acted in concert with MDF and Girón, the more he places his former client, de Marcilla, at risk. And, if Grossman attempts to soft-pedal the July 18, 2005 letter, then he is sacrificing zealous advocacy on behalf of hi current to shield a former client. It is truly a no-win situation for Grossman.

Rule 4-1.7 of the Florida Code of Professional Conduct states:

>**(a) Representing Adverse Interests.** A lawyer shall not represent a client if the representation of that client will be directly adverse to the interests of another client, unless:
>(1) the lawyer reasonably believes the representation will not adversely affect the lawyer's responsibilities to and relationship with the other client; and
>(2) each client consents after consultation.

The comments to Rule 4-1.7 state:

>As a general proposition, *loyalty to a client prohibits undertaking representation directly adverse to that client's or another client's interests without the affected client's consent*. Subdivision (a) expresses that general rule. Thus, a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated. On the other hand, simultaneous representation in unrelated matters of clients whose interests are only generally adverse, such as competing economic enterprises, does not require consent of the respective clients. *Subdivision (a) applies only when the representation of 1 client would be directly adverse to the other and where the lawyer's responsibilities of loyalty and confidentiality of the other client might be compromised.*

11

> *Loyalty to a client is also impaired when a lawyer cannot consider, recommend, or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests.* The conflict in effect forecloses alternatives that would otherwise be available to the client. Subdivision (b) addresses such situations. A possible conflict does not itself preclude the representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client. Consideration should be given to whether the client wishes to accommodate the other interest involved.

933 So.2d 438-39 (2006) (emphasis supplied). Here, the matters are not merely substantially related within the meaning of State Farm Mutual Automobile Insurance Co. v. K.A.W., 575 So.2d 630, 633 (Fla.1991) but are *identical*. As stated in The Cont'l Cas. Co. v. Przewoznik, 55 So.3d 690 (Fla. App., 2011)

Rule 4-1.7, however, has an even broader application that encompasses Alaron as well:

> The rule also prohibits the attorney from *using information relating to the representation of a former client* to the disadvantage of the former client. This rule is aimed at the problem of attorneys "switching sides," and arises because the duty of confidentiality under rule 4–1.6 protects all confidences and information obtained during representation of a client, and because this duty continues even after the attorney-client relationship is terminated.

*Id*. 575 S.2d at 692 (emphasis added).

Clearly, Grossman, has an irreconcilable conflict within the meaning of Rule 4-1.7 and must be disqualified as Plaintiffs' counsel.

## IV.

## CONCLUSION

For the matters stated herein, an Order should be entered disqualifying Grossman

12

and his law firm from representing the Plaintiffs in this action.

                                        Respectfully submitted,

                                        ALARON TRADING CORPORATION

                                        BY: ____/s/ Nicholas P. Iavarone_____
                                                Nicholas P. Iavarone, Esq.

The Iavarone Law Firm, P.C.
33 n. LaSalle Street, Suite 1400
Chicago, Illinois 60603
(312) 637-9466
(800) 417-0580 (fax)
niavarone@Iavaronefirm