UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PAULINA GUIROLA DE DAVID, CORPORACION DE FIANZAS, CONFIANZA S.A., CARLO MAURO-RHODIO GUZMAN, JESUS ALBERTO QUIROA MONTEPEQUE, ASESORES REGIONALES, S.A., DE C.V., CORPORACION DE INVERSIONES EN OPCIONES Y FUTUROS, S.A., ESBA S.A., JOSE MIGUEL GAITAN ALVAREZ,, RICARDO RAMON MAZARIEGOS CATELLANOS AND MARIA VIRGINIA GAITAN DE MAZARIEGOS, JULIO ROBERTO PINEDA AVILA, FRANCISCO JAVIER PAZ PINEDA, JUAN FERNANDO PEREZ MARROQUIN, DIDIER PATRICK WURSTER, ALFREDO PRADANOS VALDIZAN, ALBA MARIA MARLENNE MEANY VALERIO DE HAGE AND NORMA LISSETTE HERNANDEZ SANCHEZ, SAMUEL ANTONIO CHARUCO SAGASTUME, CORPORACION INTEGRAL DE INVERSIONES, S.A., <br><br> Plaintiffs, <br><br> v. <br><br> ALARON LATIN AMERICA, ALBERTO ALVAREZ, JOSE ("PEPE") ORTEGA, ALBERTO TARAFA, yet undetermined principals and yet undetermined persons, <br><br> Defendants. | Case No. 1:10-CV-03502 <br><br> Judge Robert W. Gettleman <br> Magistrate Judge Daniel G. Martin |

## **THIRD AMENDED COMPLAINT**

Plaintiffs, by and through their undersigned attorneys, complain of Defendants as follows:

<u>Summary of the Action</u>

1.      This is an action for violations of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq*. (the "Act" or "CEA") and the Regulations of the Commodity Futures Trading Commission, 17 C.F.R. § 1 *et seq.*, promulgated thereunder, the Illinois Deceptive Business Practices Act 815 ILCS 505/1 *et seq*., Florida Securities and Investor Protection Act, F.S. 517.011 *et seq*. and common law claims based on losses suffered by Plaintiffs as the result of the intentional actions, misrepresentations and omissions of each of the Defendants, acting individually and/or collectively.

2.      Beginning in or about January 2005 and continuing until in or about August 2008, Defendants continuously engaged in, and fraudulently concealed from Plaintiffs, a futures and options trading scheme that was intended to, and did, defraud Plaintiffs of millions of dollars. Plaintiffs incorrectly, but reasonably believed, based on Defendants representations, that their money had been invested in a lawful enterprise. In fact the enterprise jointly promoted and run by Alaron Trading Corporation ("ATC"), Alaron Latin America ("ALA"), Mercados de Futuros ("MDF"), and Raul Alfonso Girón Galvez ("Girón"), its managing director, was a Ponzi scheme.

3.      At all times relevant to this Complaint, Defendants, acting in concert with MDF and Girón, made multiple, material misrepresentations and omissions; fraudulently solicited Plaintiffs to open accounts with ATC/ALA and MDF allegedly to trade futures and options for investment purposes and then engaged in excessive trading of those accounts and engaged in other misconduct in order to generate commissions and other fees for themselves and Defendants – without regard to the Plaintiffs' best interests.

4.      Defendants actively participated in, facilitated, and aided and abetted the misconduct of MDF and Girón, by, among other things, 1) misrepresenting in promotion and marketing events attended by unsophisticated investors, including Plaintiffs, the capabilities of MDF, the nature of MDF's trading program and the honesty, integrity and skill of MDF, its principal, and of Defendants; 2) omitting to advise Plaintiffs and others in its promotion and marketing efforts on behalf of MDF that MDF a) was not conducting a legitimate or lawful business, b) that its representations and promises to Plaintiffs - of which the Defendants were aware - were fraudulent and misleading, and c) that MDF and the Defendants had set commissions to be paid by the Plaintiffs at levels that virtually insured the accounts could never be profitable; 3) providing incentives to MDF in order to encourage and aid and abet MDF in its unlawful trading activities, including churning of the accounts, in order to generate excessive commissions in which both MDF and the Defendants shared; and 4) paying out monthly "profits" to Plaintiffs in order to fund bogus incentive fees claimed by MDF and Girón, even though no profit was actually realized in Plaintiffs' accounts.

5.      As a consequence, Plaintiffs collectively suffered damages in lost principal and interest to date totaling no less than $20,000,000.00.

## **PLAINTIFFS**

1.       Plaintiff, Paulina Guirola de David, is and at all times relevant to this Complaint, was a citizen and resident of Guatemala. At times relevant to this Complaint she maintained one or more accounts with ATC/ALA including accounts numbered 500IB253 50061317 and 500IB253 50061339. In February 2006, two MDF sales

representatives, Mónica de Mancilla and Regina Castejón, met with Plaintiff Guirola de David at her home in Guatemala. The MDF sales representatives told Plaintiff Guirola de David about the investment with ATC/ALA, the security of the invested funds and the anticipated return. They also told Plaintiff Guirola de David that MDF would manage the trading in the account. During this meeting, the ATC/ALA's account documentation was filled out by the MDF representatives and signed by Plaintiff Guirola de David. On or about April 10, 2006, Plaintiff Guirola de David opened her investment accounts with a deposit of $20,000 USD. On March 20, 2007, Plaintiff Guirola de David attended a seminar called "Introducción al Mundo Bursátil" (Introduction to the Financial World) at Edificio Guayacan, Avenida de La Reforma 6-39 zona 10, Centro, Guatemala City, Guatemala. In or about April 2008, but no later than July 2008, Plaintiff Guirola de David attended the opening of MDF's new offices at the Edificio Avante building, 2a. Calle 23-80, Zona 15, Vista Hermosa II, Guatemala City, Guatemala. At each of these meetings, the speakers stressed the close relationship and mutual support between ATC/ALA and MDF and that an investment with them was a good and safe one. Plaintiff Guirola de David was provided a July 18, 2005 letter from ATC/ALA which vouched for MDF and gave comfort that this was so. The information provided to Plaintiff Guirola de David at these meetings were the misrepresentations plead herein at paragraphs 31, 34, 35, and 50.

2.      Plaintiff Corporacion de Fianzas, Confianza, S.A., ("CFC") is and at all times relevant to this Complaint was a business entity operating and existing under the laws of Guatemala with its principle place of business in Guatemala. Plaintiff CFC maintained one or more accounts with ATC/ALA including accounts numbered 500IB253 50040511

and 500IB253 50061337.  René Eduardo Alfredo Mario Nuyens Avila is and was at all times relevant hereto an Executive Director of Plaintiff CFC.  Mr. Nuyens personally undertook all account activities on behalf of the Plaintiff CFC.  In December 2005, Mr. Nuyens was invited to and did attend an MDF presentation by MDF representatives, Joshua Ramazini and Jorge Mancilla, at MDF's Edificio EuroPlaza World Business Center offices, at 5ta. Ave. 5-55 Zona 14, Officina 604, Guatemala City, Guatemala. This presentation focused on the close relationship between ATC/ALA and MDF and in managing the investments.   The MDF sales representatives told Mr. Nuyens that ATC/ALA was a "nice, heavy, and solid company."  Plaintiff CFC relied on these misrepresentations of security and guaranteed returns on investment when it opened an investment account with ATC/ALA.   In December 2006, Mr. Nuyens attended a second presentation at the Edificio Guayacan location.   In or about June 2008, Mr. Nuyens attended a third presentation at Edificio Avante, 2a. Calle 23-80, Zona 15, Vista Hermosa II, Guatemala City, Guatemala.   An ATC/ALA sales representative spoke at this presentation.  The information provided to Mr. Nuyens on behalf of Plaintiff CFC at these meetings were the misrepresentations plead herein at paragraphs 31, 34 35, and 50.

3.      Plaintiff Carlo Mauro-Rhodio Guzman is and at all times relevant to this Complaint was a resident of Guatemala and citizen of both Guatemala and Italy, and maintained one or more accounts with ATC/ALA including account numbered 500IB253 50061342.  In or about September 2006, Plaintiff Mauro-Rhodio, attended a seminar at the MDF Edificio Europlaza offices. On March 20, 2007, he attended the Introduction to the Financial World seminar at Edificio Guayacan.   Plaintiff Mauro-Rhodio opened an investment account with ATC/ALA because of 1) the stated guarantee of principal and a

fixed return and 2) ATC/ALA's support of the MDF program. The information provided to Plaintiff Mauro-Rhodio at these meetings were the misrepresentations plead herein at paragraphs 31, 35, and 50.

4.      Plaintiff Jesus Alberto Quiroa Montepeque is and at all times relevant to this Complaint was a citizen and resident of Guatemala. At times relevant he maintained one or more accounts with Alaron, including account numbered 500IB253 50040538.  In or about the latter months of 2005, Plaintiff Quiroa met with MDF financial advisor, Eduardo Anleu, in Guatemala City, Guatemala to discuss investments.  The MDF financial advisor told Plaintiff Quiroa that ATC/ALA is a large and highly reputable United States clearing firm that worked with MDF and that ATC/ALA was one hundred percent (100%) safe.  The information provided to Plaintiff Quiroa at the meeting were the misrepresentations plead herein at paragraphs 31, 35, and 50.

5.      Plaintiff Asesores Regionales, S.A. de CV ("ARCV") is and at all times relevant to this Complaint was a business entity operating and existing under the laws of El Salvador with its principal place of business in El Salvador. At times relevant ARCV maintained an account with ATC/ALA numbered 500IB253 50061351.  Edgar Ernesto Belloso Amaya, an El Salvadoran resident and citizen personally undertook all account activities on behalf of the Plaintiff ARCV.  In or about February 2007, Mr. Belloso met MDF representatives Girón and Ramazzini at a jointly sponsored ATC/ALA and MDF sales meeting held at the Guatemala City Intercontinental Hotel.  At that meeting Girón told Mr. Belloso that to invest with ATC/ALA and MDF, ARCV had to open an account with the ATC/ALA because MDF used ATC/ALA's technology for trade research and to execute client trades.  On February 28, 2007, Mr. Belloso visited Defendant Tarafa at

ATC/ALA's office in Miami, Florida. Defendant Tarafa introduced Mr. Belloso to ATC/ALA's Management and staff. Mr. Belloso met with ATC/ALA employees over a two (2) day period to learn about investment opportunities with ATC/ALA. During the meetings, Defendant Tarafa told Mr. Belloso that ATC/ALA worked with MDF, was very comfortable working with MDF and that ATC/ALA was supervising MDF's activities. Defendant Tarafa told Mr. Belloso that MDF was among Alaron's best introducing brokers and one of its top three Latin America introducing brokers. Mr. Belloso understood this to mean that MDF did well financially for its clients. Mr. Belloso asked Defendant Tarafa about MDF's guaranty of principal and return on capital. Defendant Tarafa told Mr. Belloso that he knew MDF was providing a guaranty against loss of principal and a fixed return on ARCV's investment. Defendant Tarafa told Mr. Belloso that the investment with Alaron through MDF was a great opportunity. In or about February 2007, Mr. Belloso transferred his ARCV account balance to a successor investment account with Alaron under the name Corporacion de Inversiones en Opciones y Futuros, S.A. *See* paragraph 6 *infra*. The information provided to Mr. Belloso on behalf of Plaintiff ARCV at these meetings were the misrepresentations plead herein at paragraphs 31, 34, 35, 36 and 50.

6.     Plaintiff Corporacion de Inversiones en Opciones y Futuros, S.A. ("CIOF") is and at all times relevant to this Complaint was a business entity operating and existing under the laws of Panama with its principal place of business in Panama. At times relevant CIOF maintained one or more accounts with Alaron numbered 500IB253 50061529 and 500IB253 50040971. CIOF is the successor in interest to ARCV. Mr. Belloso undertook all account activities on behalf of the Plaintiff CIOF entity. When the

money was transferred from the ARCV accounts to the new CIOF account, Mr. Belloso noticed the amount was less than its initial ARCV investment. Mr. Belloso told this to the MDF staff. The MDF staff told Mr. Belloso that the account had not lost any monies. MDF stated that the balance of what seemed to be missing was actually being transferred as positions between the ARCV and the CIOF accounts. Mr. Belloso called Defendant Tarafa in Miami, Florida and told Defendant Tarafa he was concerned that the amount of money that appeared in the account transfers was less than what was shown in either ARCV's or CIOF's account statements. Defendant Tarafa told Mr. Belloso that he was aware of the ARCV to CIOF transaction because he was working closely with the MDF people to make the transfer work. Defendant Tarafa told Mr. Belloso that everything was proper and that he was not going to lose a client such as Plaintiff CIOF. Defendant Tarafa assured Mr. Belloso, on behalf of ATC/ALA, that the money and trades were with ATC/ALA. That was not true. The information provided to Mr. Belloso on behalf of Plaintiff CIOF at these meetings were the misrepresentations plead herein at paragraphs 31, 34, 35, 36 and 50.

7.      Plaintiff ESBA S.A. ("ESBASA") is and at all times relevant to this Complaint was a business entity operating and existing under the laws of Guatemala with its principal place of business in Guatemala. At times relevant ESBASA maintained an account with Alaron numbered 500IB253 50061326. Victor Manuel Estrada Reyes, a Guatemalan resident and citizen personally received all account solicitations on behalf of the Plaintiff ESBASA. In or about January 2006, Mr. Estrada met with MDF sales representative, Edgar Ortega, at Plaintiff's ESBASA's offices located at 2a. Avenida 13-35 Zona 17, Ofibodegas Los Almendros No. 16, Guatemala City and discussed ESBASA

investing with MDF. On a day after January 2006 but prior to April 6, 2006, Mr. Estrada attended a presentation at MDF's offices. MDF representatives, Mr. Ramazini and Girón, provided a graphic presentation on MDF's trading success and the close working relationship between ATC/ALA and MDF. That same day of the presentation, ESBASA opened an investment account with ATC/ALA. The account documents were filled out by the MDF representatives and signed by Mr. Estrada on behalf of Plaintiff ESBASA. ESBASA's initial April 6, 2006 investment with ATC/ALA was a participation in a pool of funds managed by MDF. By the first half of 2007, ESBASA decided to close the account. In an effort to stop ESBASA from withdrawing funds, ATC/ALA invited Mr. Estrada to visit ATC/ALA's offices in Miami, Florida. From June 7 through June 10, 2007, Mr. Estrada visited ATC/ALA's offices in Miami, Florida accompanied by MDF representatives, Mr. Ramazini and Mr. Ortega. During this visit, Defendant Tarafa met with Mr. Estrada and told him that MDF's activities were supported by ATC/ALA and therefore, there was no possibility of a loss to ESBASA's investment. Defendant Tarafa also told Mr. Estrada that he anticipated substantial growth for the ESBASA account if it continued its investment with ATC/ALA and MDF. Relying on Defendant Tarafa's statements, Mr. Estrada moved the balance of the initial investment account to a direct investment at ATC/ALA to be managed by MDF. On or about July 3, 2008, Mr. Estrada was invited to and did attend a seminar at the new MDF offices in the Edificio Avante. At that meeting, Defendant Tarafa and Girón assured the attendees of the success and security in the ATC/ALA MDF investments. The information provided to Mr. Estrada on behalf of Plaintiff ESBASA at these meetings were the misrepresentations plead herein at paragraphs 31, 34, 35, 36 and 50.

8.      Maria Virginia Gaitán de Mazariegos and José Miguel Gaitán Alvarez, are father and daughter, and at all times relevant to this Complaint hereto were and remain residents and citizens of Guatemala.  At times relevant they maintained one or more joint accounts with Alaron, including account numbered 500IB253 50040517.  Early in 2005, Plaintiff Gaitán de Mazariegos was invited and attended a meeting at MDF's Edificio EuroPlaza offices, where MDF staff explained the investment opportunity.  On October 19, 2005, Plaintiff Gaitán de Mazariegos opened an investment account with her father, Plaintiff Jose Gaitán.  Between July 2006 and December 2006, Plaintiffs Gaitán de Mazariegos, Jose Gaitán and Ricardo Mazariegos (the "Gaitán de Mazariegos family") attended two presentations at the Hotel Intercontinental in Guatemala.  Defendant Tarafa was present at the first presentation and other ATC/ALA personnel were present at the other presentations. At the first of these joint Alaron MDF presentations, Defendant Tarafa spoke with Plaintiff Gaitán de Mazariegos family and told them their investments were secure because ATC/ALA and MDF allocated only thirty percent (30%) of their investment to trade exposed transactions or to market risk.  Defendant Tarafa told them that this strategy was permitted under U.S. laws and regulations and it enabled them to guaranty the remaining seventy percent (70%) of Plaintiff Gaitán de Mazariegos family's investment.  Plaintiff Gaitán de Mazariegos family was unaware this statement did not accurately describe how the account's funds were deployed in the futures markets. Defendant Tarafa told them that with MDF's trading expertise the investment was essentially risk free. Defendant Tarafa assured Plaintiff Gaitán de Mazariegos family that their investment with ATC/ALA through MDF would be safe, under the close supervision of ATC/ALA, and that ATC/ALA and MDF worked closely to monitor all

account activities. Defendant Tarafa told them that ATC/ALA would provide detailed daily and monthly account activity statements, while MDF representatives would be available locally to provide any direct assistance. The information provided the Plaintiffs Gaitán de Mazariegos, Jose Gaitán, and Ricardo Mazariegos at these meetings were the misrepresentations plead herein at paragraphs 31, 34, 36, 35 and 50.

9.      Plaintiffs Ricardo Ramon Mazariegos Catellanos and Maria Virginia Gaitan de Mazareigos are husband and wife. They are, and at times relevant to this Complaint were, citizens and residents of Guatemala. At times relevant to this Complaint they maintained a joint account with Alaron numbered 500IB253 50040444. Early in 2005, Plaintiff Gaitán de Mazariegos and her husband Plaintiff Ricardo Mazariegos were invited and attended a meeting at MDF's Edificio EuroPlaza offices, where MDF staff explained the investment opportunity. On April 5, 2005**,** Plaintiff Gaitán de Mazariegos and Ricardo Mazariegos opened a joint investment account. Between July 2006 and December 2006, Plaintiffs Gaitán de Mazariegos, and Ricardo Mazariegos attended two presentations at the Hotel Intercontinental in Guatemala. *See* paragraph 8 *supra*. The information provided Plaintiff Gaitán de Mazariegos, and Ricardo Mazariegos at these meetings were the misrepresentations plead herein at paragraphs 31, 34, 35 and 50.

10.     Plaintiff Julio Roberto Pineda Avila is and at all times relevant to this Complaint was a citizen and resident of Guatemala. At times relevant he maintained an account with Alaron numbered 500IB253 50040425. In or about December 2004, Plaintiff Pineda was contacted by MDF representative Carmen Morales. In January 2005, Plaintiff Pineda entered into his investment with ATC/ALA. In or about August 2006, Plaintiff Pineda was invited to and did attend a joint Alaron MDF presentation at the Hotel

Intercontinental in Guatemala. Plaintiff Pineda met Defendant Tarafa at the presentation. Plaintiff Pineda was induced to invest in the ATC/ALA MDF program based on ATC/ALA's strong support of MDF. The information provided to Plaintiff Pineda at these meetings were the misrepresentations plead herein at paragraphs 31, 34, 36 and 50.

11.     Plaintiff Francisco Javier Paz Pineda is and at all times relevant to this Complaint was a citizen and resident of Guatemala. At times relevant he maintained an account with Alaron numbered 500IB253 50040486. In or about September of 2005 Plaintiff Paz was contacted by Girón and MDF representative Cristina Mendez regarding an investment opportunity with ATC/ALA through MDF. In October 2005, Plaintiff Paz entered into his investment with ATC/ALA. In or about June 2007 through August 2007, Plaintiff Paz attended a presentation at the Hotel Intercontinental in Guatemala City. Defendant Tarafa and one other ATC/ALA Representative were present. At this presentation, it was represented to Plaintiff Paz that Girón was able to control and make secure trading profits in commodity futures. The MDF representative told him that 1) his principal would be guaranteed against loss, 2) his rate of return would be secure and 3) his account would be with a United States financial firm and traded on domestic United States markets. The information provided to Plaintiff Paz at these meetings were the misrepresentations plead herein at paragraphs 31, 34, 36 and 50.

12.     Plaintiff Juan Fernando Perez Marroquin is and at all times relevant to this Complaint was a citizen and resident of Guatemala. At times relevant to this Complaint he maintained an account with Alaron numbered 500IB253 50040534. In or about December 2005 to January of 2006 Girón and MDF's Chief Executive Officer of Operations, Arturo Martinez, solicited his investment with ATC/ALA at MDF's

EuroPlaza Zona 14 offices. Girón and Martinez told Plaintiff Perez that the investment provided protection of capital and a good and secure return on his investment. In 2006, Plaintiff Perez met Defendant Tarafa at MDF's offices in Guatemala. After that initial meeting, they also met at joint Alaron MDF seminars and presentations. At those seminars Defendant Tarafa described ATC/ALA as a great supporter of MDF and as such the investors were "in good hands" with ATC/ALA's agent, MDF. Defendant Tarafa talked about MDF's exceptional ability to trade the markets successfully. When Plaintiff Pérez opened his trading account with ATC/ALA, he was instructed to and did open a bank account at Total Bank in Miami, Florida. Plaintiff Perez was told that ATC/ALA would wire his alleged monthly profits to that account. MDF staff instructed Plaintiff Perez to pay MDF its profit participation proceeds from this account. MDF staff told Plaintiff Pérez to pay attention to the account balance when reviewing his account activity statements from ATC/ALA. In or about June or July 2008, Plaintiff Pérez was invited to celebrate the opening of MDF's new offices at Edificio Avante, in Guatemala City. At the event he met with Girón and Defendant Tarafa. Plaintiff Perez told Defendant Tarafa and perhaps others from ATC/ALA, that MDF was making more money than Plaintiff Pérez was receiving from his investment. Defendant Tarafa advised Plaintiff Perez to speak to Girón about renegotiating a higher interest rate. Defendant Tarafa told Plaintiff Perez that his account was profitable; however, he knew or should have known that Plaintiff Pérez's trading account was not profitable. The information provided to Plaintiff Perez at these meetings were the misrepresentations plead herein at paragraphs 31, 34, 35 and 50.

13.     Plaintiff Didier Patrick Wurster is at all times relevant to this Complaint was a citizen of Switzerland and a resident of Guatemala.  At times relevant to this Complaint he maintained an account with Alaron numbered 500IB253 50040890. He was informed about the investment opportunity with ATC/ALA from his friend Plaintiff Quiroa. Plaintiff Wurster was interested in the investment because his friend Plaintiff Quiroa advised him of ATC/ALA's and MDF's guarantee on principal and rate of return. Plaintiff Wurster was introduced to ATC/ALA through MDF representative Mr. Anleu in the latter part 2006 to early 2007.  The information provided to Plaintiff Wurster at this meeting were the misrepresentations plead herein at paragraphs 31, 35 and 50

14.     Plaintiff Alfredo Prádanos Valdizan is and at all times relevant to this Complaint was a citizen and resident of Guatemala with dual Spanish citizenship.  At times relevant he maintained an account with ATC/ALA.  In or about July to August 2004, Plaintiff Prádanos was introduced to MDF through his friend Jorge Gonzalez-Campo, an MDF representative, who then introduced him to Girón. Girón described the investment as an investment opportunity with ATC/ALA; promising a guaranteed return of principal and a fixed return on the money to be earned.  In or about August to September 2004, Plaintiff Prádanos met with Defendant Alvarez in the MDF offices located at EuroPlaza Guatemala City.  Girón referred Plaintiff Prádanos to Defendant Tarafa in ATC/ALA's Miami, Florida offices.  In or about late December of 2004, Plaintiff Prádanos traveled to Miami, Florida and met with Defendant Tarafa at ATC/ALA's Miami office where Plaintiff Prádanos was introduced to Defendant Ortega and other Alaron staff.  Defendant Tarafa told Plaintiff Prádanos the Miami office was a branch of the ATC in Chicago, Illinois.  Defendant Tarafa told Plaintiff Prádanos that ATC/ALA supported MDF, that

MDF provided a good opportunity based on its historical trading ability and that Defendant Tarafa knew Girón for a long time as someone who could be trusted. In or about Feburary or March 2005, relying upon Defendant Tarafa statements and ATC/ALA's market position, Plaintiff Prádanos opened an investment account with ATC/ALA. Plaintiff Prádanos was instructed to open a bank account with Total Bank, located in Miami, Florida, for purposes of receiving transfers of the alleged trading profits from ATC/ALA. MDF representatives instructed Plaintiff Prádanos to focus on current account balance figures found in ATC/ALA's account statements, as an indication of the account's profitability. Plaintiff Prádanos also received monthly account activity statements from MDF. The information on the statements generated by MDF coincided with the information on the account activity statements from ATC/ALA. Plaintiff Prádanos received wire transfers of the alleged trading profits from ATC/ALA to his Total Bank account on a regular basis. Plaintiff Prádanos met with Defendant Tarafa after he opened his trading account with ATC/ALA on at least two separate occasions. First, on or about December 16, 2005, at the home of MDF representative Irene Mendizabal in Guatemala. The second meeting took place in or about December 2005 when Plaintiff Prádanos was invited by MDF to attend and did attend an award recognition event at the Edificio Guayacan in Guatemala. At this event, Defendant Tarafa, on behalf of ATC/ALA, presented MDF with a plaque for MDF's best performance as an introducing broker. Plaintiff Prádanos believed this award was for performance on behalf of its customers. Plaintiff Prádanos was unaware that Defendant Tarafa and ATC/ALA gave this award to MDF because MDF raised the most account money for ATC/ALA - not for producing profits on the behalf of clients. The information

provided to Plaintiff Prádanos at these meetings were the misrepresentations plead herein at paragraphs 31, 34, 35, 36 and 50.

15.     Plaintiffs Alba Maria Marlenne Meany Valerio de Hage and Norma Lissette Hernandez Sanchez are and at all times relevant to this Complaint were citizens and residents of Guatemala.  At times relevant they maintained an account with Alaron numbered 500IB253 50061494. In or about December 2007, Plaintiffs Valerio de Hage and Sanchez met with MDF representative who gave a presentation at Plaintiff Valerio be Hage's office located at 20 Calle 15-20 Zona 13 in Guatemala City, Guatemala.  MDF's representatives Ms. Castejon and Mr. Anleu solicited their investment on behalf of ATC/ALA.  Plaintiff Guirola de David, had previously recommended the investment with ATC/ALA to Plaintiff Valerio de Hage based on misrepresentations made to her.  In or about March of 2008, Plaintiffs Valerio de Hage and Sanchez opened an investment account with ATC/ALA, with the assistance of Mr. Anleu at MDF's offices in Guatemala City.  There was a sense of urgency to sign the contract quickly.  Mr. Anleu told Plaintiffs Valerio de Hage and Sanchez that ATC/ALA is very strict and selective as to who can become its client.  This gave Plaintiffs Valerio de Hage and Sanchez the impression that ATC/ALA was very careful in its sales programs and monitoring of their client accounts.  In or about May of 2008, Plaintiffs Valerio de Hage and Sanchez transferred funds for their investment with ATC/ALA.  Shortly thereafter they began to receive daily and monthly account activity statements from ATC/ALA.  They also received monthly account statements from MDF.  The information in the MDF account statements coincided with the information on the respective account statements from ATC/ALA.     Plaintiffs Valerio de Hage and Sanchez were instructed to pay attention to

the current account balance figures when reviewing their account activity statements from ATC/ALA. ATC/ALA staff assisted Plaintiffs Valerio de Hage and Sanchez in the transfer of money from their Alaron account to their personal Miami bank account. Plaintiffs Valerio de Hage and Sanchez were instructed to open the bank account in Miami in order to receive transfers of alleged trading profits from ATC/ALA for payment of alleged profit participations to MDF. The information provided to Plaintiffs Valerio de Hage and Sanchez about their investments are the misrepresentations plead herein at paragraphs 31, 35 and 50.

16.     Plaintiff Samuel Antonio Charuco Sagastume is and at all times relevant to this Complaint was a citizen and resident of Guatemala. At times relevant he maintained an account with Alaron numbered 500IB253 50040561. In or about July 2005, Plaintiff Charuco met with MDF representative, Edgar Ortega, at MDF Edificia EuroPlaza offices, to talk about investment opportunities. In September 2005, Plaintiff Charuco, relying on the information received regarding Alaron and MDF, opened an investment account with ATC/ALA with the assistance of MDF office staff. On March 20, 2007, Plaintiff Charuco was invited to and did attend an Alaron MDF presentation on investment opportunity at Edificio Guayacan, Plaintiff Charuco met Girón who told him ATC/ALA was a clearing house that offered limited exposure to risk, and guaranteed sixty percent (60%) of the invested funds and a secure and specific rate of return. A few months later, Plaintiff Charuco attended another presentation with MDF representatives who reiterated Girón's representations regarding Alaron's backing. He was instructed to open a bank account at Total Bank in Miami, Florida. Subsequently, Plaintiff received daily and monthly account activity statements from ATC/ALA and monthly account statements

generated by MDF. The information on the ATC/ALA monthly account statements coincided with the information on the MDF statements. ATC/ALA staff arranged for payments of the alleged profit in Plaintiff Charuco's Alaron account to be paid to Plaintiff Charuco's Miami bank account for him to make profit participation payments to MDF. Relying on the fact that the ATC/ALA staff assisted in this profit participation payments, Plaintiff Charuco believed his trading account was profitable. Plaintiff Charuco did not understand the information on his account activity statements from ATC/ALA. When he asked for an explanation, Mr. Ortega, an MDF representative told him to pay attention to the account balance. The information provided to Plaintiff Charuco about his investments are the misrepresentations plead herein at paragraphs 31, 35 and 50.

17. Plaintiff Corporacion Integral de Inversiones, S.A. ("CII") is, and at all times relevant to this Complaint was a business entity operating and existing under the laws of and with its principal place of business in, Guatemala. At times relevant CII maintained an account with Alaron numbered 500IB253 50060647. Edwin David Abboud, a Guatemalan resident and citizen personally undertook all account activities on behalf of the Plaintiff CII. In or about July 2005, Mr. David on behalf of Plaintiff CII attended a meeting with, Castejón and Girón, at the MDF Edificio EuroPlaza offices to discuss CII's investment opportunities with ATC/ALA. Plaintiff CII's dealings with Defendants are directly based upon and related to Plaintiff Guirola de David's dealings with Defendants. Subsequent to opening an investment account, Plaintiff CII received daily and monthly account activity statements from ATC/ALA. Plaintiff CII received account activity statements generated by MDF. Mr. David did not understand the information on Plaintiff CII's account activity statements from ATC/ALA. Mr. David requested explanations and

was instructed to pay attention to the account balance figure for a current status of the account. Plaintiff CII received wire transfers of alleged trading profits from ATC/ALA on a regular basis. Due to this misrepresentation, Mr. David believed the Plaintiff CII's account was profitable. The information provided to Mr. David on behalf of Plaintiff CII about its investments are the misrepresentations plead herein at paragraphs 31, 34, 35 and 50.

## **DEFENDANTS**

18.     At all times, Alaron Trading Corporation ("ATC") was an Illinois corporation with its principal place of business at 822 W. Washington, Chicago, IL 60607. ATC was registered with the Commodity Future Trading Commission ("CFTC") as a futures commission merchant ("FCM"). In its capacity as an FCM, ATC offered a variety of commodity futures services, including brokerage, clearing of trades and electronic trading to customers worldwide, including Plaintiffs. ATC conducted business pursuant to its registration as an FCM through more than two dozen names, including Alaron Latin America. ATC conducted trades on behalf of and at the request of foreign introducing brokers (FIB) and foreign commodity trading advisors ("FCTA"), including MDF.

19.     On or about November 30, 2012, ATC filed a voluntary petition under Chapter 7 of Title 11 of the United States Code and is protected by the automatic stay set forth in 11 U.S.C. § 362(a). Accordingly, Plaintiffs withdraw their claims as against ATC, but continue to allege and pursue primary liability on the part of ATC to the extent that such liability may be asserted jointly, severally, vicariously or otherwise against Defendants ALA, Alvarez, Ortega and/or Tarafa.

20.      At all relevant times, Defendant Alaron Latin America ("ALA") was a branch office of ATC, with offices in Miami and doing business in Florida and other locations. ALA was a partnership under Illinois law owned 50% by ATC, 25% by Defendant Alberto Alvarez, and 25% by Defendant Jose "Pepe" Ortega.  As set forth on his business cards, and in his email signature block, Alberto Alvarez was "Managing Partner" of ALA.  Pursuant to their agreement, each partner of ALA received a percentage of ALA's net profits and accepted responsibility for a share of any losses.  Such profit shares were separate and apart from commission and other income earned by Alberto Alvarez and Jose "Pepe" Ortega as employees of ATC or ALA.  ALA had its own business practices and pricing, as well as its own base of customers, separate and apart from those of ATC. In view of the foregoing, under the law of partnerships, each of ALA, ATC, Alvarez and Ortega were and are jointly and severally liable for the wrongful conduct of the others.

21.      At all relevant times, Defendant Alberto Inocente Alvarez ("Alvarez") was a partner in ALA, an employee of ATC and/or ALA and a branch manager of ATC and/or ALA.  Upon information and belief Alvarez is and was at all times relevant to this Complaint a citizen and resident of the state of Florida.

22.      At all relevant times, Defendant Alberto Tarafa ("Tarafa") was an employee of ATC and/or ALA and was responsible for Latin American sales.  Upon information and belief Tarafa is and was at all times relevant to this Complaint a citizen and resident of the state of Florida.

23.      At all relevant times, Defendant Jose "Pepe" Ortega ("Ortega") was a partner in ALA, an employee of ATC and/or ALA, and a branch manager of ATC and/or ALA.

ALA  Upon information and belief Ortega is and was at all times relevant to this Complaint a citizen and resident of the state of Florida.

**24.**     At all relevant times, non-defendant Mercados de Futuros ("MDF") was a FIB and FCTA of ATC/ALA with its principal place of business in Guatemala City, Guatemala.  MDF conducted trades on United States commodity markets through ATC/ALA.  Together with ATC/ALA and the other Defendants, MDF and Girón induced Plaintiffs and other investors from Guatemala and other Central American countries to open Alaron accounts to be directed by MDF and Girón.  Girón was MDF's Chief Executive Office (CEO) and head trader.  Girón is currently incarcerated in Guatemala for his participation in the activities described here in.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1331, in that the acts alleged in this Complaint state a cause of action under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq*. and 28 U.S.C. § 1332, in that, Plaintiffs are, and at all times relevant were, citizens and residents of foreign countries, and Defendants are citizens and residents of either Illinois or Florida.

26.     The Court has supplemental subject matter jurisdiction over the state law claims herein pursuant to 28 U.S.C. § 1367.

27.     The amount in controversy as to each Plaintiff exceeds $75,000.00.

28.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

### Defendants Business Relationship with MDF

29.     MDF was a company based in Guatemala City, Guatemala and owned and controlled by Girón. At all times relevant to this Complaint Girón was acting within the scope of his employment with MDF.

30.     Upon information and belief at all times relevant to this Complaint MDF and Girón introduced customer accounts exclusively to ATC/ALA.  MDF and Alaron shared the compensation paid by the customers, including Plaintiffs, derived from the unlawful activities described below.  At all times relevant to this Complaint Girón and MDF were agents of ATC/ALA acting within the scope of their agency.

31.     With the active assistance and participation of ATC/ALA, and the individual Defendants, Girón and MDF, acting as agents of ATC/ALA, fraudulently solicited customers in Latin America to trade commodity futures and options through ATC/ALA. In or about August of 2003 Defendants Alvarez and Ortega travelled to Guatemala City and met with officials of MDF, at their Edificio Europlaza offices to plan the business alleged herein to be a Ponzi scheme.  During the meetings Defendants Alvarez and Ortega went for drinks with MDF officials including Mr. Mancilla.  Mr. Mancilla explained to Defendants Alvarez and Ortega that MDF would be soliciting business by guarantying principal and a pre-agreed upon rate of return on account trading. Defendant Ortega stated to MDF staff his belief that ATC/ALA could not do business with MDF if it would be guarantying principal and a minimum return on futures trading. MDF staff explained to Defendants Alvarez and Ortega that it is necessary for MDF to provide those guarantees and a high rate or return rather than the local market rates of return otherwise the MDF would not be able to compete for customer monies that would otherwise be deposited with local financial institutions such as banks.  Defendants

Alvarez and Ortega met with Girón the next day, and although it is unknown what was said in that meeting at the Europlaza offices, the ATC/ALA MDF business went forward and MDF, supported by ATC/ALA, continued to provide false profit guaranties to their investors for investing with ATC/ALA through the services of MDF.

32.     As early as August 2003, Defendants met with Girón to discuss MDF becoming an FIB of ATC/ALA.  As a consequence of that and subsequent meetings, at all times relevant to this Complaint Defendants knew that MDF's solicitations of investors included 1) a guarantee against loss of principal;  2) a guaranteed minimum rate of return on funds; and 3) misrepresentations relating to the skill, experience and success of the trading by Girón.  Defendants also knew through meetings with Girón as well as reviews of MDF's trading activity that MDF's guarantees were false and misleading in that Girón never intended to, nor could, deliver on those guarantees.

33.     Despite knowledge of those and other misrepresentations of MDF and Girón, Defendants agreed to take MDF on as an FIB and agent of ATC/ALA.  Defendants originally contemplated charging a commission rate of $35 per round turn contract (i.e. a purchase and sale of one futures contract), more than double the going rate.  Realizing the Plaintiffs and other Latin American clients were unsophisticated with respect to trading of commodity futures and options and would not realize that they were being overcharged, Defendants and MDF agreed to charge the clients $42 per round turn contract, almost three times the going rate.  Defendants and MDF shared the grossly inflated commissions charged to Plaintiffs and other investors.

34.     Defendants knew that at a commission rate of $42 per round turn it was improbable for actively traded accounts, as were Plaintiffs' accounts, to be traded

profitably. At no time, however, did Defendants advise Plaintiffs of this material fact, despite multiple occasions in Guatemala and Miami when it could have done so.

### Joint Defendant-MDF Marketing Effort

35. As part of the strategy to solicit and induce prospective Latin American investors, including Plaintiffs, to open accounts with ATC/ALA, MDF and Defendants embarked upon a joint marketing effort. In connection with that effort, Defendant Tarafa, upon information and belief, with the knowledge and agreement of the other Defendants, regularly travelled to Guatemala and other Latin American countries to participate in promotion and marketing events with Girón and MDF, communicated with MDF and Girón through telephonic or electronic mail communications or other instrumentalities of interstate commerce and solicited and induced potential investors to open accounts with ATC/ALA and MDF. During those meetings, including meetings attended by Plaintiffs Guirola de David, CFC, through its agent, ARCV, through its agent, CIOF, through its agent, ESBA, through its agent, Gaitan de Mazariegos, Gaitan and Mazariegos, Pineda, Paz, Perez, Prádanos and CII, through its agent, Tarafa represented that a) Girón was one of the five best and highly profitable traders in South America; b) ATC/ALA was very selective in its choice of FIB traders and would only work with the best; and c) ATC/ALA had great confidence in Girón 's skill and expertise and was fully supportive of MDF personnel. These representations were false and known to be false at the time they were made.

36. At no time at any of the meetings recited in this Complaint or otherwise, did Defendant Tarafa, MDF or any of the other Defendants advise Plaintiffs or other potential investors that in fact Girón and MDF were 1) regularly and consistently losing money for

their clients; 2) had neither the capacity, the skill and experience, nor the intention to satisfy any of the guarantees made to Plaintiffs in soliciting their accounts; 3) were falsely advising Plaintiffs that their accounts were profitable, demanding and receiving incentive fees on profits that did not exist; or 4) concealing the losses in the accounts through an options scheme more fully described below.

37. Defendants also sponsored events for MDF introduced investors at Defendants' U.S. offices in Miami, Florida. These investors traveled from Central America to Miami to attend Defendants' lectures and to meet with Defendants in order to ask Defendants questions about the futures markets. During those meetings, Tarafa was often joined by Alvarez and Ortega who either reiterated or acquiesced to virtually identical representations as those made by Tarafa in Guatemala or other Latin American venues. Still they failed to disclose the facts reflected in paragraph 35 above.

38. The purpose of the representations and omissions by Defendants was to induce Plaintiffs and others to open trading accounts with ATC/ALA that would be traded by ATC/ALA's agents, MDF and Girón, on a discretionary basis. ATC/ALA authorized MDF employees to communicate with Plaintiffs concerning the formation and documentation of the accounts. All ATC/ALA account documentation was in the English language. Reasonably relying on those representations by Defendants, as well as lulling statements by MDF employees, each of the Plaintiffs opened one or more accounts with ATC/ALA and gave power of attorney to MDF and Girón to trade those accounts on a discretionary basis. Account documentation was executed by Plaintiffs and forwarded to Defendants through the mails and/or other instrumentalities of interstate commerce.

39.     Further, Defendants knew and intended that the misrepresentations and other fraudulent conduct of Defendants and Girón and MDF in these meetings would be communicated to and relied upon by, other potential – and ultimately actual – clients.

40.     As each of the accounts opened by Plaintiffs was to be traded by ATC/ALA'a agents, MDF and Girón on a discretionary basis, Plaintiffs had a fiduciary relationship with Defendants, MDF and Girón and each of the Defendants owed a duty of utmost loyalty to Plaintiffs.  As described more fully herein, Defendants ignored their duty of loyalty and breached their fiduciary obligations.  Instead, they traded Plaintiffs' accounts for the sole benefit of themselves, MDF and Girón.

### Excessive Trading and Commission Sharing Arrangement

41.     All trading in the Plaintiffs' accounts with ATC/ALA was conducted on a discretionary basis by MDF and Girón.  Plaintiffs did not place orders for their accounts. All trading was conducted on designated contract markets registered with the CFTC.

42.     The accounts of each of the Plaintiffs were charged $42.00 per round turn trade. Thus, for example, on a purchase and sale of 10 futures contracts the account would be charged $420. One half of this amount was paid to ATC/ALA, plus certain additional transaction fees and costs due to ATC/ALA.  This commission was almost three times the customary amount charged for this type of business.

43.     In order to increase trading in the accounts, Defendants gave MDF a monetary incentive.  Upon information and belief, Defendants agreed to reduce their fees by $1.00 for every additional one-thousand turns generated per month. For example, for the first one-thousand turns in one month, Defendants charged MDF $21.00 per turn.  For the

second one-thousand turns in the same month, Defendants charged MDF $20.00 per turn. For the third one-thousand turns in that month, Defendants charged MDF $19.00 per turn.

44.     Grabbing on to this incentive, MDF and Girón accelerated the size and turnover rate of its trading on behalf of Plaintiffs and others with total disregard of their best interests.   Upon information and belief, after Defendants introduced this incentive Defendants' business with MDF grew from one-thousand (1,000) turns per month to at least four-thousand (4,000) turns per month.

45.     At no time during this increase in the velocity and scale of trading did any account of the Plaintiffs realize a profit.   Nonetheless, MDF and Girón, encouraged and assisted by  ATC/ALA, continued to trade in ever increasing volumes for the sole purpose of generating commission income.   Defendants were aware of and participated in this activity, but at no time advised Plaintiffs of this misconduct.

### Defendants Concealed Trading Losses from Plaintiffs

46.     As required by CFTC regulations Defendants sent monthly account statements to Plaintiffs through the mails or other instrumentalities of interstate commerce.   The "account liquidating balance" or "net liquidity" portion of the monthly statements reflected the true value in the account, *i.e.* the profit/loss that would be payable if all open positions in the account were closed at the days settlement price (i.e. the price set by the exchange as the value of the contract at the end of the day) and the account was reduced to cash.   The monthly statements also reflected an amount designated "cash value.,"." This amount reflected the amount of cash that was on deposit in the account without regard to any open positions against which the cash value was being held.

47.     For example, in simple terms, a trader could sell a put option (entitling the buyer at its election to receive a short futures contract from the seller at a specified price, the strike price).  A short futures position loses value as the price of the underlying commodity increases.  Likewise, the short put option position loses value.  Thus, if the extent of the loss in the future position exceeds the amount of the premium received on the sale of the put, the transaction results in a loss to the trader. These mark-to-market losses (*i.e.* unrealized declines in value of the account's positions) are not reflected in the "cash value." The "cash value" reflected cash in the account plus the sum of cash received on the sale of a put or call option, but NOT the amount of the mark-to-market loss that would reduce that value when the option was bought back. The mark to market loss would be reflected in the liquidation value of the account.

48.     In the course of their trading on behalf of Plaintiffs, MDF and Girón aggressively traded and consistently lost money - primarily in Euro dollar and West Texas Intermediate (WTI) crude futures contracts.

49.     In order to conceal those losses, MDF and Girón sold deep in the money puts or calls, *i.e.* options with high cash value but significant ongoing risk. These options generated "cash value" for Plaintiffs but not realized profits.  The value brought into the account through MDF's options trading, was not yet earned and remained at risk and eventually led to additional losses in the Plaintiffs' accounts.

50.     MDF's options trading scheme, thus, artificially and misleadingly increased the "cash value" reflected in the monthly statement, while the net liquidating value of the account was sharply reduced as a consequence of the high risk of the positions and the additional commissions being charged for those transactions.

51.     MDF and Girón told Defendants' customers that the realized profit of their account was reflected in the "cash value" portion of the account statements. They told customers that the "net liquidity" portion of the statement was not relevant and should be ignored.

52.     MDF also provided its own monthly statement to customers. The alleged profits reported in MDF's monthly statements, purporting to reflect the account status as of the middle of the month, were intentionally misleading and deceitful. Defendants were aware of these material misrepresentations by MDF and Girón, but at no time advised Plaintiffs, even during their regular presentations to clients and prospective customers.

53.     To further conceal the ongoing and growing losses in Plaintiffs' accounts and to facilitate incentive fee payments to MDF to which it was not entitled each month, MDF and Girón sent separate customer statements, created by MDF that reported false profits to Plaintiffs. MDF would then request that ATC/ALA transfer sufficient funds from Plaintiffs' accounts into accounts at a local Miami bank that Girón and MDF had insisted Plaintiffs open. Although this procedure was contrary to industry practice and Defendants knew the accounts were not profitable, they nonetheless prepared and cut checks for this illusory profit. Not realizing that the accounts were not profitable or that this process was irregular, Plaintiffs thereafter paid the "incentive fee" on the phantom profits to MDF.

54.     As a consequence of the fraudulent scheme of Defendants, MDF and Girón, each of the Plaintiffs was injured in an amount greater than $75,000 and aggregate losses to Plaintiffs from Defendants unlawful and malicious conduct exceeded $20 million.

55.     Plaintiffs did not discover and in the exercise of reasonable diligence could not have discovered the Defendants' scheme until August 2008 when the MDF offices were finally shut down as the result of media reports that the Guatemalan government was conducting a criminal investigation into MDF's trading activities.

<u>COUNT ONE</u>

COMMODITY EXCHANGE ACT FRAUD (7 U.S.C.§ 6b)

56.     The allegations of paragraphs 1 - 55 are incorporated herein by reference as though fully set forth.

57.     The representations, omissions and other actions of Defendants set forth above were made in connection with orders to make, and the making of, contracts of sale of commodities in interstate commerce or for future delivery made on or subject to the rules of a designated contract markets including the New York Mercantile Exchange, Chicago Mercantile Exchange and the Chicago Board of Trade.

58.     In violation of Section 4b of the Act, the representations, omissions and other misconduct of defendants described above were intended to, and in fact did, cheat and defraud and deceive Plaintiffs into opening and maintaining accounts for the trading of futures and options on futures with ATC/ALA that were traded by Girón and MDF to the detriment of Plaintiffs.

59.     Plaintiffs justifiably relied on the representations and omissions of Defendants. As a direct and proximate result of Defendants' misconduct Plaintiff's were injured in an amount to be determined at trial but in the aggregate not less than $20,000,000.00.

<u>COUNT TWO</u>

COMMODITY EXCHANGE ACT OPTIONS FRAUD, (<u>7 U.S.C. 6c(b)</u>)

60.    The allegations of paragraphs 1 - 59 are incorporated herein by reference as though fully set forth.

61.    Section 4c(b) of the CEA makes it unlawful to offer to enter into, enter into, or confirm the execution of any transaction involving any commodity regulated under the CEA, which is of the character or commonly known to the trade as an option, contrary to any rule, regulation or order of the CFTC.

62.    CFTC Regulation 32.9, makes it unlawful for any person directly or indirectly (a) to cheat or defraud or attempt to cheat or defraud any other person; (b) to make or cause to be made to any other person any false report or statement; or (c) to deceive or attempt to deceive any other person by any means whatsoever, in or in connection with an offer to enter into, the entry into, or the confirmation of the execution of, any commodity option transaction.

63.    In violation of Section 4c(b) of the CEA the representations, omissions and other misconduct of Defendants described above with respect to options transactions were intended to, and in fact did, cheat and defraud and deceive Plaintiffs into opening and maintaining accounts with ATC/ALA that were traded by Girón and MFD to the detriment of Plaintiffs.

64.    Plaintiffs justifiably relied on the representations and omissions of Defendants. As a direct and proximate result of Defendants' misconduct Plaintiff's were injured in an amount to be determined at trial but in the aggregate not less than $20,000,000.00.

COUNT THREE

PRINCIPAL LIAILITY (7 U.S.C. § 2(a)(1)(B))

65.     The allegations of Paragraphs 1 - 64 are incorporated herein by reference as though fully set forth.

66.     Pursuant to 7 U.S.C. § 2(a)(1)(B), all Defendants, with the exception of Defendant Tarafa  are liable to the Plaintiffs for the acts, omissions, or failures of their employees and agents—including the acts, omissions and failures of MDF and its employees—as set forth in Counts One and Two above.

67.     As a result of these actions, Plaintiffs were damaged by the loss of value of their accounts together with the commissions and associated fees paid to Defendants, in a total of at least $20,000,000.00.

COUNT FOUR

AIDING AND ABETTING VIOLATIONS OF THE CEA (7 U.S.C. §23(a)(1)(A – C))

68.     The allegations of paragraphs 1 – 67 are incorporated herein by reference as though fully set forth.

69.     The misrepresentations, omissions and other misconduct of Defendants described above with respect to futures and options transactions violated Section 4b and Section 4 c(b) of the CEA.

70.     In connection with those acts Plaintiffs a) received trading advice for a fee from Girón and MDF; b) had futures contracts and options on futures contracts executed for their account by Defendants at the direction of MDF and Girón; and c) deposited funds in connection with such futures contracts and options on futures contracts.

71.     Defendants were aware and participated in the unlawful misrepresentations and omissions of material information and of other misconduct of MDF and Girón and the

violations of the CEA, shared in the intent of MDF and Girón to cheat and defraud Plaintiffs and substantially and unlawfully aided and abetted those violations by various means including but not limited making independent misrepresentations of material fact regarding the trading expertise of Girón and MDF.

72. As a direct and proximate result of Defendants' misconduct Plaintiff's were injured in an amount to be determined at trial but in the aggregate not less than $20,000,000.00.

## COUNT FIVE

### VIOLATIONS OF ILLINOIS LAW

Illinois Consumer Fraud and Deceptive Business Practice Act

(815 ILCS 505/1, *et seq.*)

73.     The allegations of paragraphs 1 - 72 are incorporated herein by reference as though fully set forth.

74.     At all relevant times the principal place of business of ATC was located in Chicago, Illinois.   At all relevant timest, ALA was a branch office of ATC and a partnership of which ATC was a 50% owner and member.  Plaintiffs' contracts included choice of law provisions establishing that their terms shall be governed by the law of the State of Illinois.

75.     The representations, omissions and other misconduct of Defendants described above were made in connection with orders to make, and the making of, contracts of sale of commodities in interstate commerce.

76.     The representations, omissions and other misconduct of Defendants described above were intended to, and in fact did, cheat and defraud and deceive Plaintiffs in violation of the Illinois Consumer Fraud and Deceptive Trade Practice Act, 815 ILCS 505/1, *et. seq*.

77.     Plaintiffs justifiably relied on the representations and omissions of Defendants.

78.     As a direct and proximate result of Defendants' actions Plaintiff's were injured in an amount to be determined at trial but in the aggregate not less than $20,000,000.00.

## COUNT SIX

### VIOLATIONS OF FLORIDA LAW

Florida Securities and Investor Protection Act

(F.S. 517.011 *et seq.*)

79.     Paragraphs 1– 78 above are re-alleged and incorporated herein by reference as if fully restated herein.

80.     Defendants, by entering upon the courses of actions outlined above, violated F.S. 517.275 and therein, F.S. 517.301, in connection with the purchase and sale of a commodity, commodity futures and/or commodity option which act or practice constitutes a violation of provisions of the CEA, including the rules and regulations promulgated there under or of an investment security, including (exempted securities and securities transaction), in that Defendants:

    a.  employed devices, schemes, or artifices to defraud the Plaintiffs,

    b.  obtained money or property from the Plaintiffs by means of untrue statements of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c.  engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon the Plaintiffs.

81.     At all relevant times the principal place of business of ALA was located in Miami, Florida, from where Defendants Alvarez, Ortega and Tarafa conducted their business..

82.     The representations, omissions and other misconduct of Defendants described above were made in connection with orders to make, and the making of, contracts of sale of commodities in interstate commerce.

## COUNT SEVEN

### COMMON LAW FRAUD

83.     The allegations of paragraphs 1 - 80 are incorporated herein by reference as though fully set forth.

84.     As set forth above, Defendants made materially false statements and omissions of fact to Plaintiffs.

85.     Defendants knew that such statements and omissions were false and intended for their false statements to induce Plaintiffs to open and maintain accounts with ATC/ALA that were then used by Defendants, Girón and MDF to defraud Plaintiffs through various means.

86.     The Plaintiffs justifiably relied on the representations and omissions of Defendants.

87.     As a direct and proximate result of Defendants' misconduct Plaintiff's were injured in an amount to be determined at trial but in the aggregate not less than $20,000,000.00.

88.     The misrepresentation, omissions and other unlawful actions of Defendants were intentional, malicious and willful. Plaintiffs, therefore, are entitled to an award of punitive damages in an amount to be determined at trial.

## COUNT EIGHT

## CONSPIRACY TO DEFRAUD

89.     The allegations of paragraphs 1 - 88 are incorporated herein by reference as though fully set forth.

90.     Commencing in and around January 2005 and continuing through out the relevant period, Defendants, MDF and Girón and each of them, contrived maliciously, unlawfully, and wrongfully to cheat, deceive and defraud Plaintiffs as set forth above and engage in or facilitate excessive and unauthorized trading  in Plaintiff's accounts for their mutual benefit.

91.     During this time, pursuant to the conspiracy and in furtherance of the design and purposes thereof, Defendants, Girón and MDF made materially false statements and omissions, excessively traded in Plaintiff's accounts, received commissions and other fees from such trades, paid out false "profits" to Plaintiffs and facilitated and encouraged MDF's misconduct, in addition to other actions as set forth above.

92.     Because of the conspiracy among and between Defendants, Girón and MDF, and the overt acts of the Defendants and their co-conspirator, MDF, pursuant to the conspiracy and in furtherance of the design and purpose of it, Plaintiffs were injured in an amount to be determined at trial but in the aggregate not less than $20,000,000.00.

93.     The misrepresentation, omissions and other unlawful actions of Defendants were intentional, malicious and willful.  Plaintiffs, therefore, are entitled to an award of punitive damages in an amount to be determined at trial.

## COUNT NINE

### BREACH OF FIDUCIARY DUTY

94.     The allegations of paragraphs 1 – 93 are incorporated herein by reference as though fully set forth.

95.     By opening trading accounts with ATC/ALA and transferring funds into those accounts, Plaintiffs confided and trusted in Defendants to handle and monitor their accounts according to applicable law, and to ensure that trading in those accounts occurred lawfully and as represented by Defendants, Girón and MDF.

96.     The handling of Plaintiffs' accounts by Defendants, Girón and MDF showed complete indifference to, and conscience disregard for, the best interest of Plaintiffs, and was in reckless disregard of Plaintiffs' rights with full realization of the probable results.

97.     As a direct and proximate result of Defendants' breach of fiduciary duty Plaintiffs were injured in an amount to be determined at trial but in the aggregate not less than $20,000,000.00.

98.     The misrepresentation, omissions and other unlawful actions of Defendants were intentional, malicious and willful.  Plaintiffs, therefore, are entitled to an award of punitive damages in an amount to be determined at trial.

### COUNT TEN

### NEGLIGENT SUPERVISION

99.     The allegations of paragraphs 1 – 98 are incorporated herein by reference as though fully set forth.

100.    Defendant Tarafa was the broker of record responsible for, and compensated on the basis of, Plaintiffs' accounts.  At all relevant times, Defendant  Tarafa operated under

the direct supervision of ATC and Defendants ALA, Alvarez and Ortega. As set forth above, ATC, ALA, Alvarez and Ortega knew or had reason to know that Plaintiffs would be subjected to an unreasonable risk of harm by allowing ALA Defendant Tarafa to manage Plaintiffs accounts. Likewise, ATC, ALA, Alvarez and Ortega knew that Defendant Tarafa was unfit and untrustworthy to manage Plaintiff's accounts.

101. ATC, ALA, Alvarez and Ortega each owed a duty to Plaintiffs to establish, maintain, and enforce a system of supervision over their offices and employees, to ensure that trading in Plaintiff's accounts proceeded consistent with the law.

102. During the relevant time period, ATC, ALA, Alvarez and Ortega each breached that duty to Plaintiffs in that they failed to establish, maintain and enforce a system of supervision over their office, ALA, and employee, including Defendant Tarafa, so as to prevent fraudulent behavior and excessive trading in Plaintiffs' accounts.

103. As a direct and proximate result of the failure of ATC, ALA, Alvarez and Ortega to properly supervise their branch office, ALA, and employees, including DefendantTarafa, Plaintiffs were injured in an amount to be determined at trial but in the aggregate not less than $20,000,000.00.

104. The misrepresentation, omissions and other unlawful actions of Defendants were intentional, malicious and willful. Plaintiffs, therefore, are entitled to an award of punitive damages in an amount to be determined at trial.

<u>COUNT ELEVEN</u>

FRAUDULENT CONCEALMENT

105.    The allegations of paragraphs 1 - 104 are incorporated herein by reference as though fully set forth.

106.    Defendants, Girón and MDF, as set forth above, concealed material facts from Plaintiffs and Defendants had a duty to disclose these facts to Plaintiffs.

107.    In order to conceal these material facts, Defendants and MDF, acting through Girón, made materially false statements and omissions of facts to Plaintiffs.

108.    Defendants and MDF knew that such statements and omissions were false and intended for their false statements to induce Plaintiffs to open and maintain accounts with ATC/ALA that were then used by Defendants, Girón and MDF to defraud Plaintiffs through various means.

109.    Plaintiffs neither knew, nor could have known of Defendant's misconduct until late August 2008.

110.    Plaintiffs justifiably relied upon the representations and omissions of Defendants.

111.    As a direct and proximate result of Defendants' misconduct Plaintiffs were injured in an amount to be determined at trial but in the aggregate not less than $20,000,000.00.

112.    The misrepresentation, omissions and other unlawful actions of Defendants were intentional, malicious and willful.  Plaintiffs, therefore, are entitled to an award of punitive damages in an amount to be determined at trial.

## COUNT TWELVE

## UNJUST ENRICHMENT

113. The allegations of paragraphs 1 - 112 are incorporated herein by reference as though fully set forth.

114. As set forth above, Plaintiffs were deceived by multiple fraudulent misrepresentations and omissions by Defendants and MDF.

115. As a result of Defendants and MDF's fraudulent misrepresentations and omissions, Plaintiffs conferred a benefit on Defendants by investing in excess of $10,000,000 in accounts with ATC/ALA. Defendants further benefitted from the commissions and fees charged to Plaintiffs' accounts, as a result trades executed by MDF in Plaintiffs' accounts, which Defendants retained.

116. Under such circumstances, it would be unjust for Defendants to retain the benefits conferred upon them by Plaintiffs, and Defendants' retention of such benefits would violate fundamental principles of justice, equity and good conscience.

117. As a direct and proximate result of Defendants' actions and those of MDF, Plaintiffs were injured in an amount to be proved at trial but in the aggregate not less than $10,000,000.00.

118. The misrepresentation, omissions and other unlawful actions of Defendants were intentional, malicious and willful. Plaintiffs, therefore, are entitled to an award of punitive damages in an amount to be determined at trial.

## COUNT THIRTEEN

## PARTNERSHIP LIABILITY

119.    The allegations of paragraphs 1 – 118 are incorporated herein by reference as though fully set forth.

120.    As set forth above, ALA was a common law partnership, the members of which were ATC, Alvarez and Ortega.

121.    Pursuant to Illinois law, or alternatively Florida law, each such partner is jointly and severally liable for the wrongful acts and omissions of the partnership and of his partners.

122.    Accordingly, Defendant Alvarez is jointly and severally liable for the wrongful acts of ATC and/or Ortega, and Defendant Ortega is jointly and severally liable for the wrongful acts of ATC and/or Alvarez.


<u>Prayer for Relief</u>

WHEREFORE, Plaintiffs respectfully requests that this Court:

1)  Award Plaintiffs compensatory damages in an amount to be proven at trial;

2)  Award Plaintiffs punitive damages in an amount to be proven at trial;

3)  Award Plaintiffs reasonable attorneys' fees and costs; and

4)  Grant such further relief as this court deems just and proper.


Dated: Chicago, IL
        July 18, 2014


                                    <u>/s/ William G. Primps</u>

                                    William G. Primps
                                    Dorsey & Whitney LLP
                                    51 West 52nd Street
                                    New York, NY 10019-6119
                                    Telephone (212) 415-9307

Facsimile  (212) 214-0514
primps.william@dorsey.com
*Counsel to Plaintiffs*

/s/ Matthew J. Press

Matthew J. Press
The Chrysler Building
405 Lexington Avenue, Seventh Floor
New York, NY  10174
Telephone:  (212) 922-1111
Facsimile:  (347) 342-3882
mpress@presslawfirm.com
*Counsel to Plaintiffs*

/s/ Michael P. Conway

Michael P. Conway
Grippo & Elden LLC
111 South Wacker Drive
Chicago, IL 60606
Telephone:  (312) 704-7700
Facsimile:  (312) 558-1195
mconway@grippoelden.com
*Counsel to Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 18, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/Michael P. Conway*
Michael P. Conway

**SERVICE LIST**
**Paulina Guirola De David,** *et al.***, v. Alaron Latin America,** *et al.*
**Case No. 1:10-cv-03502**
**United States District Court, Northern District of Illinois**

| | |
|---|---|
| Michael A. Rosen, Esq.<br>Fowler Rodriguez Valdes-Fauli<br>355 Alhambra Circle, Suites 801<br>Coral Gables, FL 33134<br>(786) 364-8400 (phone)<br>(786) 364-8401 (fax)<br>Email:  mrosen@frvf-law.com<br><br>*And*<br><br>Eugene E. Gozdecki, Esq.<br>Jeffery M. Heftman, Esq.<br>Gozdecki, Del Guidice, Americus<br>& Farkas LLP<br>One East Wacker Drive, Suite 1700<br>Chicago, IL  60601<br>(312) 782-5010 (phone)<br>(312) 782-4324 (fax)<br>Email: j.heftman@gozdel.com<br>        g.gozdecki@gozdel.com<br><br>*Counsel to Defendant Jose "Pepe"*<br>*Ortega* | Kevin Michael Flynn<br>Kevin M. Flynn & Associates<br>77 West Wacker Drive, Suite 4800<br>Chicago, IL  60601<br>(312) 456-0240 (phone)<br>(312) 444-1028 (fax)<br>Email:  Kevin@Kmflynnlaw.com<br>*Counsel to Defendant Alberto*<br>*Alvarez*<br><br><br>James B. Koch<br>Gariner Kock Weisberg & Wroma<br>53 West Jackson<br>Chicago, IL 60604<br>(312) 362-0000 (phone)<br>(305) (312) 362-0404 (fax)<br>Email: AlbertoT1921@yahoo.com<br>*Counsel to Defendant Alberto*<br>*Tarafa*<br><br><br>James A. McGurk<br>Law Offices of James A. McGurk<br>P.C.<br>10 South LaSalle Street, Suite<br>3300<br>Chicago, IL 60603<br>(312) 236-8900 (phone)<br>(312) 277-3497 (fax)<br>Email: jamcgurk@flash.net<br>*Counsel to George de Marcilla* |