IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAULINA GUIROLA DE DAVID, | ) | |
| CORPORACION DE FIANZAS, CONFIANZA | ) | |
| S.A., CARLO MAURO-RHODIO GUZMAN, | ) | |
| JESUS ALBERTO QUIROA MONTEPEQUE | ) | |
| ASESORES REGIONALES, S.A., DE C.V., | ) | |
| CORPORACION DE INVERSIONES EN | ) | No. 10 CV 3502 |
| OPCIONES Y FUTUROS, S.A., ESBA S.A., | ) | |
| JOSE MIGUEL GAITAN ALVAREZ, | ) | Judge Robert W. Gettleman |
| RICARDO RAMON MAZARIEGOS | ) | |
| CATELLANOS AND MARIA VIRGINIA | ) | |
| GAITAN DE MAZARIEGOS, JULIO | ) | |
| ROBERTO PINEDA AVILA, FRANCISCO | ) | |
| JAVIER PAZ PINEDA, JUAN FERNANDO | ) | |
| PEREZ MARROQUIN, DIDIER PATRICK | ) | |
| WURSTER, ALFREDO PRADANOS | ) | |
| VALDIZAN, ALBA MARIA MARLENNE | ) | |
| MEANY VALERIO DE HAGE AND NORMA | ) | |
| LISSETTE HERNANDEZ SANCHEZ, | ) | |
| SAMUEL ANTONIO CHARUCO | ) | |
| SAGASTUME, CORPORACION INTEGRAL | ) | |
| DE INVERSIONES, S.A., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| ALARON TRADING CORPORATION d/b/a | ) | |
| ALARON LATIN AMERICA, ALBERTO | ) | |
| ALVAREZ, JOSE ("PEPE") ORTEGA, | ) | |
| ALBERTO TARAFA, yet undetermined | ) | |
| principals and yet undetermined persons, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs, eighteen Latin American corporations and individuals, sued defendants Alaron Trading Corporation ("ATC") d/b/a Alaron Latin America ("ALA") and three of ALA's managers and employees, Alberto Alvarez, Jose "Pepe" Ortega, and Alberto Tarafa, alleging thirteen counts in the Third Amended Complaint. Plaintiffs' claims include four counts under the

Commodity Exchange Act ("CEA")[1] and nine counts under state law.[2] Defendants Alvarez, Ortega, and Tarafa ("defendants") have moved pursuant to Fed. R. Civ. P. 56 for summary judgment on all counts. For the reasons stated below, defendants' motion for summary judgment is granted in part and denied in part.

## BACKGROUND[3]

ATC is a Chicago-based futures commissions merchant ("FCM") founded by Joel Greenberg. In 2004, Greenberg reached out to Alvarez to discuss opening a new ATC office in Miami, Florida, that would focus on the Latin American market. Eventually, Alvarez and Ortega agreed with Greenberg to do so. They called the new office ALA. Under the agreement, Alvarez and Ortega each received one-quarter of the office's net profit. The parties dispute whether, under this agreement, ALA was a new partnership among ATC, Alvarez, and Ortega, or was simply a branch of ATC. Regardless, Alvarez worked for ALA as a branch manager and Ortega handled the office's accounting and financing. ALA hired Tarafa to serve as its Latin American sales representative.

---

[1] Commodity Exchange Act Fraud, 7 U.S.C. § 6b (Count I); Commodity Exchange Act Options Fraud, 7 U.S.C. § 6c(b) (Count II); Principal Liability, 7 U.S.C. § 2(a)(1)(B) (Count III); and Aiding and Abetting Violations of the Commodity Exchange Act, 7 U.S.C. § 23(a)(1)(A)-(C) (Count IV).

[2] Violations of Illinois Consumer Fraud and Deceptive Business Practice Act, 815 ILL. COMP. STAT. 505/1 et seq. (Count V); Violations of Florida Securities and Investor Protection Act, F.S. 517.011 et seq. (Count VI); Common Law Fraud (Count VII); Conspiracy to Defraud (Count VIII); Breach of Fiduciary Duty (Count IX); Negligent Supervision (Count X); Fraudulent Concealment (Count XI); Unjust Enrichment (Count XII); and Partnership Liability (Count XIII).

[3] Unless otherwise noted, these facts are taken from the parties' Local Rule 56.1 Statements of Material Facts.

In early 2004, Giron Galvez ("Giron"), partial owner of a Guatemalan registered broker-dealer called Mercados de Futuros ("MDF"), contacted Tarafa, seeking to become ATC's foreign introducing bank ("FIB"). In July 2004, Alvarez and Ortega met with Giron in Guatemala. During this meeting, Giron told them that MDF offered customers fixed rates of interest on their investments and guaranteed their principal. Although such guarantees would have violated United States law if a domestic company offered them, the three men reached a deal that avoided issues with United States law. During the next several years, Giron introduced over one hundred customers to ATC and ALA, including plaintiffs. ATC and ALA then acted as the clearing broker for these customers by executing trades, issuing account statements, and holding funds. In return, ATC and ALA collected significant clearing fees and commissions.

Over the years, defendants maintained a tight relationship with Giron and MDF. ALA sent its employees to train MDF's trading group in Guatemala and provided trading equipment and software to MDF. ALA and MDF hosted over half-a-dozen joint marketing events in Guatemala that allowed MDF to gain credibility through its association with an American broker. At these joint events, ALA employees, including Tarafa, extensively praised Giron. For example, they stated that ALA worked only with the best FIB traders and that Giron was just that, one of the best. At an MDF employee Christmas party, Tarafa gave Giron a plaque for his work as the top foreign introducing broker of the year. However, these accolades badly missed the mark. Giron was not a successful trader but, rather, a fraudster.

In 2008, MDF collapsed after it failed to return money invested by the Guatemalan Congress. The Guatemalan government arrested and convicted Giron after it was discovered that MDF had been churning customers' accounts to maximize commissions and other fees while

incurring massive losses on the trades. MDF hid the losses on the commodity trading statements sent to customers. In reality, net liquidity reveals how an account is performing. But, according several deponents and declarants, including George de Marcilla ("de Marcilla") and Ernesto Belloso, Giron and MDF's salespeople told customers that the cash balance was the best indicator of performance. MDF then convinced customers that they were making money by selling deep in-the-money call options to boost cash balances.[4] These "profits," which were actually the customers' principal, were used to pay MDF's and ATC's commissions and fees. In the end, plaintiffs lost over twenty million dollars before the fraud was revealed.

## DISCUSSION

Defendants have moved for summary judgment pursuant to Fed. R. Civ. P. 56. Summary judgment is appropriate where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56. The movant bears the burden of establishing both elements. Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir. 1990). If the movant satisfies this burden, then the non-movant must set forth specific facts showing there is a genuine issue for trial. Nitz v. Craig, No. 08 C 334, 2013 WL 593851, at *2 (N.D. Ill. Feb. 12, 2013). The court "must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." Orton-Bell v. Indiana, 759 F.3d 768, 773 (7th Cir. 2014).

In their briefs, defendants have documented extensive evidence supporting their arguments and called into question much of the evidence supporting plaintiffs' Local Rule 56.1

---

[4] Defendants attack the admissibility of Ronald Filler's expert report, but the court does not find it necessary to address defendants' arguments on this matter in light of the other evidence and material issues of fact.

Statement of Material Facts. At the summary judgment stage, however, a "court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence . . . ." Orton-Bell, 759 F.3d at 773 (quoting Abdullahi, 423 F.3d at 769). Thus, to the extent plaintiffs have provided any contrary admissible evidence on each contested issue, summary judgment is precluded.

## Counts I, II, and VII

Counts I, III, and VII of plaintiffs' third amended complaint allege various acts of fraud. Count I alleges a fraud claim under Section 4b of the CEA, 7 U.S.C. § 6b, Count II alleges a claim for fraud under Section 4c(b) of the CEA, 7 U.S.C. § 6c(b), through CFTC Regulation 17 C.F.R. § 32.9, and Count VII alleges a common law fraud claim. Both claims under the CEA are governed by the common law fraud standard. Hodgson v. Gilmartin, No. CIVA 06-1944, 2006 WL 2869532, at *9 (E.D. Pa. Oct. 5, 2006). "Under Illinois law, the elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce . . . plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." Ohio Nat'l Life Assurance Co. v. Davis, 13 F.Supp.3d 876, 882 (N.D. Ill. 2014). As discussed below, defendants' argument that plaintiffs cannot satisfy each of the five elements is defeated by genuine issues of material fact that preclude summary judgment.

Plaintiffs have identified several false statements of material fact made by Tarafa at joint marketing events hosted by Giron, MDF, and ALA. At these events, Tarafa told attendees that ALA worked only with the best FIB traders and that ALA had confidence in Giron because he was one of the best. Tarafa even claimed that Giron was a profitable trader who rarely lost

5

money. Then, at three MDF employee Christmas parties, Tarafa gave Giron three plaques for his work as the top foreign introducing broker of the year. Essentially, the award recognized Giron's role in generating business for ATC and ALA, and he displayed the awards in MDF's office. As revealed by the collapse of MDF, arrest of Giron, and discovery of his fraud, Tarafa's statements and awards were based on fraudulent conduct.

There is significant evidence that these statements and acts were material. For example, Arturo Martinez and Ernesto Belloso explained how endorsement by an American broker gave Giron and MDF credibility. This in turn allowed them to solicit customers who would not have listened without ALA's endorsement. For these reasons, in denying defendants' motion to dismiss, this court has found that Tarafa's alleged statements were material, not mere puffery. De David v. Alaron Trading Corp., 814 F. Supp. 2d 822, 829 (N.D. Ill. 2011).

Defendants correctly note that neither Alvarez nor Ortega made these false statements. However, Arturo Martinez's affidavit and Robert Barrios' deposition indicate that the making of such supportive statements during joint marketing events was part of ALA's business plan. Likewise, Ernesto Belloso explained that the statements were important to the relationship between Giron and ALA. Of course, both Alvarez and Ortega were involved in the formation of ALA's plan. Further, de Marcilla, an ALA branch manager, told Alvarez that Tarafa wanted de Marcilla to write that Giron was one of the best traders. At a minimum, Alvarez knew of the type of praise Tarafa used in connection with Giron and knew that Alvarez went to the joint marketing events. Less directly, Belloso asserted that Ortega, because of his position, should have known or actually did know of Tarafa's statements. Based on the totality of this evidence, a

6

reasonable trier of fact could infer that Alvarez and Ortega directed or acquiesced in Tarafa's statements.

Further, the first element of common law fraud – a false statement – may be satisfied by a defendant's failure to disclose a material fact where the defendant had a duty to disclose. Gavin v. AT&T Corp., 543 F. Supp. 2d 885, 911-12 (N.D. Ill. 2008). Here, plaintiffs have presented evidence that defendants had a fiduciary relationship with plaintiffs and knew of Giron's and MDF's fraud[5] but failed to disclose any of the material facts about the fraud. Therefore, even if Alvarez and Ortega were not responsible for Tarafa's statements, there would still be a genuine issue of material fact as to whether their omissions satisfy the first element of a common law fraud claim.

In regard to the second element of common law fraud, plaintiffs have provided some evidence that defendants knew Giron was not a successful trader and that Giron and MDF were engaging in fraud. De Marcilla became highly suspicious of Giron and MDF when he reviewed their trading practices. He then told every defendant that Giron did not know how to trade, was losing money, and was running a fraud. As early as 2006, he specifically told Ortega that Giron was running a "Ponzi scheme." This was not de Marcilla's first or last warning. Eventually, defendants appear to have taken notice of Giron's and MDF's practices because they tried to get Giron to change his investing strategy. For example, Alvarez sent de Marcilla to Guatemala to talk Giron out of selling deep-in-the-money call options, and Tarafa contacted Giron multiple times to ask him to protect his short positions on oil futures. Further, de Marcilla testified and Jason Estrada asserted in his declaration that Giron and other MDF employees instructed

---

[5] The details of these issues are discussed in subsequent portions of the opinion.

investors to look at their account balances to determine performance even though those numbers did not accurately reflect their accounts' performance. Estrada's declaration also asserts that it was generally known in the ALA office that Giron and MDF miseducated their customers. This evidence creates a genuine issue of material fact as to whether defendants' knew of the falsity of Tarafa's statements or the truth about Giron's and MDF's fraud.

Defendants have not contested the third element of common law fraud, intent to induce action, and therefore the court will not address it.

With respect to the fourth element, plaintiffs have presented significant testimony that defendants' misrepresentations and omissions not only induced plaintiffs to trust Giron, but were intended to do so. Defendants argue, though, that plaintiffs' reliance was unreasonable because, (1) ATC's account-opening documents disclaimed any endorsement of any other organization, and (2) ATC's daily, monthly, and yearly account statements disclosed the performance of their accounts. Defendants' arguments fail for a number of reasons.

First, the account-opening documents are of little relevance because general boilerplate language that does not mention Giron or MDF cannot absolve defendants of responsibility for their subsequent, repeated, effusive endorsements of Giron and MDF. See Beedie v. Battelle Mem'l Inst., No. 01 C 6740, 2002 WL 22012, at *4 (N.D. Ill. Jan. 7, 2002). Second, there is a dispute as to whether ATC's statements were sufficient to make plaintiffs' reliance unreasonable. ATC's account statements are difficult to decipher, and at the same time plaintiffs received the statements, they also received statements from MDF that showed positive cash balances. Moreover, there is evidence that Giron and MDF incorrectly taught plaintiffs that cash balances, not net liquidity, were the best indicators of performance. Thus, even if ATC's and

MDF's account statements were accurate, they may not have properly informed plaintiffs of their investments' performance. Despite evidence that defendants were aware of Giron's and MDF's incorrect guidance on reading the account statements, defendants did nothing to correct plaintiffs' misperception. Consequently, a reasonable trier of fact could conclude that plaintiffs' failure to fully appreciate and resolve the conflict may have been reasonable. See Evanston Bank v. Conticommodity Services, Inc., 623 F. Supp. 1014, 1029 (N.D. Ill. 1985) (reliance "after limited inquiry" may be justified where defendants' actions "lull" a plaintiff "into a false sense of security").

On the final element, causation, defendants argue that they are entitled to summary judgment for two reasons, neither of which is availing. First, defendants assert that plaintiffs have failed to demonstrate loss causation. But, "courts have observed that loss causation is not a statutory element of proof under the CEA." In re Crude Oil Commodity Futures Litig., 913 F. Supp. 2d 41, 60 (S.D.N.Y. 2012) (citing Kohen v. Pac. Inv. Mgmt. Co. LLC, 244 F.R.D. 469, 475 (N.D. Ill. 2007)). Second, defendants argue that plaintiffs' damages were due to the inherently risky nature of the investments. However, one of the central components of plaintiffs' claims is that Giron and MDF engaged in excessive trading, thereby taking excessive fees and commissions. Such churning has nothing to do with the risky nature of the investments. Also, it is reasonable to infer that Giron and MDF exposed plaintiffs to greater than normal risks because their trades were crafted to perpetrate, and subsequently hide, their fraud.

Finally, defendants argue that plaintiffs have waived their right to pursue their CEA and common law fraud claims by ratifying Giron's and MDF's trading activity. This argument is of little value because plaintiffs' claims attack defendants' fraud, not the specific trades made by

9

Giron and MDF. Even if ratification were relevant, a "principal . . . is not bound by a ratification made without knowledge of material facts about the agent's act unless the principal chose to ratify with awareness that such knowledge was lacking." Toney v. Quality Res., Inc., No. 13 CV 42, 2014 WL 6757978, at *12 (N.D. Ill. Dec. 1, 2014). Here, the crux of plaintiffs' claim is that Giron, MDF, and defendants pulled the wool over their eyes. If plaintiffs were as ignorant as some of their evidence indicates, they cannot possibly have had sufficient knowledge to ratify Giron's and MDF's trades. See Karlen v. Ray E. Friedman & Co. Commodities, 688 F.2d 1193, 1200 (8th Cir. 1982) ("When a customer lacks the skill or experience to interpret confirmation slips, monthly statements or other such documents, courts have generally refused to find that they relieve a broker of liability for its misconduct."). Thus, there is a genuine issue of fact as to whether plaintiffs ratified Giron's and MDF's trades.

## Count III

The court has already dismissed Count III with prejudice. (Doc. 72).

## Count IV

Count IV alleges a claim for aiding and abetting violations of the CEA. 7 U.S.C. § 23(a)(1)(A)-(C). "Generally stated, to recover on an aiding and abetting claim under the CEA, a plaintiff must prove that the defendant[s] (1) had knowledge of the principal's intent to violate the CEA; (2) intended to further that violation; and (3) committed some act in furtherance of the principal's objective." In re Amaranth Natural Gas Commodities Litig., 587 F. Supp. 2d 513, 531 (S.D.N.Y. 2008). As discussed above, plaintiffs have demonstrated genuine issues of material fact as to whether defendants knew of Giron's and MDF's fraud. If defendants were aware of the

fraud and continued to assist Giron and MDF, intent to further the fraud could reasonably be inferred.

Finally, plaintiffs have presented evidence that each defendant committed acts that "made a substantial contribution to the perpetration of the fraud," JP Morgan Chase Bank v. Winnick, 406 F. Supp. 2d 247, 257 (S.D.N.Y. 2005). Plaintiffs have shown that ALA expended significant resources to train and support Giron and MDF, hosted joint marketing events with them, and promoted them. Plaintiffs have presented evidence that Ortega and Alvarez were aware of and directed these actions and that Tarafa appeared at and made false statements during the events. Plaintiffs have presented evidence that these actions allowed Giron and MDF to not only remain in business, but also grow larger by attracting new clients. Finally, plaintiffs have presented evidence that, while doing this, defendants knew of Giron's and MDF's fraud. This evidence is sufficient to create genuine issues of material fact as to whether such acts substantially furthered the fraud.

## Count V

Count V alleges a claim under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILL. COMP. STAT. 505 et seq. (2006). "The [ICFA] does not apply to fraudulent transactions which take place outside Illinois." Vulcan Golf, LLC v. Google Inc., 552 F. Supp. 2d 752, 775 (N.D. Ill. 2008) (citing Avery v. State Farm Mut. Auto. Ins. Co., 835 N.E.2d 801, 850 (Ill. 2005)) (internal quotation marks omitted). Defendants assert that plaintiffs cannot prove "the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." Id. Although plaintiffs have a burden to "inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered," De v. City of Chicago,

912 F. Supp. 2d 709, 733 (N.D. Ill. 2012) (quoting Reklau v. Merch. Nat'l Corp., 808 F2d 628, 630 n.4 (7th Cir. 1986)), they have failed even to address defendants' argument on this point. Thus, summary judgment is granted on Count V.

### Count VI

Count VI alleges a claim under Section 517.301 of the Florida Securities and Investor Protection Act. Section 517.301 requires: "(1) a misrepresentation or omission of a material fact; (2) justifiably relied on; (3) that the misrepresentation or omission was made in connection with a purchase or sale of securities; (4) with scienter or reckless disregard as to the truth of the communication; and (5) that the untruth was the direct proximate cause of the loss." Compania de Elaborados de Cafe v. Cardinal Capital Mgmt., Inc., 401 F. Supp. 2d 1270, 1280 (S.D. Fla. 2003). Defendants argue that this count must be dismissed because plaintiffs failed to demonstrate that defendants personally participated in or aided the wrongful conduct. As discussed above, genuine issues of material fact exist as to this count.

### Count VIII

Count VIII alleges a claim for common law conspiracy to defraud. The elements of such a claim in Illinois are: "(1) a conspiracy; (2) an overt act of fraud in furtherance of the conspiracy; and (3) damages to the plaintiff as a result of the fraud." Damato v. Merrill Lynch, Pierce, Fenner & Smith, Inc., No. 94 C 3143, 1996 WL 164312, at *3 (N.D. Ill. Apr. 1, 1996) aff'd sub nom. Damato v. Hermanson, 153 F.3d 464 (7th Cir. 1998). Defendants argue that they did not know of Giron and MDF's fraud, did not agree with them to further the fraud, and did not take action to perpetrate the fraud. The same genuine issues of material fact discussed above are present with respect to this count.

Count IX

Count IX alleges a claim for common law breach of fiduciary duty. "To state a claim for breach of fiduciary duty under Illinois law, a plaintiff must plead: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damages to the plaintiff as a result of that breach." McLaughlin v. Chicago Transit Auth., 243 F. Supp. 2d 778, 779 (N.D. Ill. 2003). Defendants argue that plaintiffs have not established a duty because defendants acted solely in a non-discretionary broker capacity. However, "courts will impose liability when the clearing firm goes beyond ministerial or routine clearing functions and directs or contrives in the fraudulent trades." De David, 814 F. Supp. 2d at 829. As discussed above, plaintiffs have presented evidence that defendants actually took part in perpetrating Giron's and MDF's fraud. Thus, genuine issues of material fact preclude the granting of summary judgment as to this count.

Count X

The court has already dismissed Count X with prejudice. (Doc. 72).

Count XI

Count XI alleges a claim for common law fraudulent concealment. The elements of such a claim are: "(1) the concealment of a material fact; (2) [] the concealment was intended to induce a false belief, under circumstances creating a duty to speak; (3) [] the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) [] the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) [] reliance by the person from whom the fact was concealed led to his injury." Iron Workers Tri-State Welfare Plan v. Jaraczewski, No.

02 C 2596, 2002 WL 31854972, at *4 (N.D. Ill. Dec. 19, 2002) (quoting Trustees of AFTRA Health Fund v. Biondi, 303 F.3d 765, 777 (7th Cir. 2002)).

Defendants argue that plaintiffs cannot prove their claim because they cannot show fraudulent acts by each defendant. As discussed above, plaintiffs have provided some evidence of fraudulent actions taken by each defendant. Further, "passive silence is sufficient to trigger the fraudulent concealment doctrine when the defendants are in a continuing fiduciary relationship with the plaintiff." Fid. Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co., No. 00 C 5658, 2001 WL 477162, at *2 (N.D. Ill. May 3, 2001) (quoting Pitts v. Unarco Industries, Inc., 712 F.2d 276, 279 (7th Cir.1983)). Plaintiffs have provided some evidence that defendants were in a fiduciary relationship with plaintiffs. Thus, there are genuine issues of material fact with respect to Count XI.

## Count XII

Count XII alleges a claim for unjust enrichment. To prevail on this claim, plaintiffs must show that defendants have "unjustly retained a benefit to the plaintiffs['] detriment, and that defendants['] retention of the benefit violates the fundamental principles of justice, equity, and good conscience." Reid v. Unilever U.S., Inc., 964 F. Supp. 2d 893, 922 (N.D. Ill. 2013). Defendants assert that plaintiffs cannot prove an unjust enrichment claim for three reasons.

First, defendants note that unjust enrichment is not a separate cause of action that justifies recovery on its own. The court rejects this argument because plaintiffs' fraud claims, upon which Count XII is based, have survived defendants' motion. Second, defendants note that an unjust enrichment claim cannot be sustained where the disputed matter was governed by an express contract between the parties. Here, though, plaintiffs did not have contracts with the individual

defendants, and their contracts with ATC/ALA did not cover fraudulent trading and churning. Third, defendants assert that they did not benefit by the fraudulent scheme. However, the alleged scheme generated significant, potentially excessive, clearing fees for ALA. These fees were distributed to defendants through commissions and profit sharing. This constitutes a benefit. Thus, defendants are not entitled to judgment on Count XII as a matter of law.

## Count XIII

Count XIII alleges a partnership liability claim against Alvarez and Ortega. Under Illinois law, a partnership and its partners are liable for the wrongful acts or omissions of any partners. In re Keck, Mahin & Cate, 274 B.R. 740, 745 (Bankr. N.D. Ill. 2002). A "person who receives a share of the profits of a business is presumed to be a partner in the business . . . ." 805 ILL. COMP. STAT. 206/202(c)(3). Both Alvarez and Ortega received a share of ALA's profits and losses. Ortega continued to receive his share even after shifting most of his attention to another company. Further, Greenberg testified that ALA was a partnership and Alvarez was a partner. Defendants referred to themselves as partners, sometimes even in communications with third parties. This evidence is sufficient to create a genuine issue of material fact as to whether Alvarez and Ortega were partners in ALA.

## **CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment is granted with respect to Count V and denied with respect to Counts I, II, IV, VI, VII, VIII, IX, XI, XII, and

XIII. This matter is set for a report on status May 21, 2015, at 9:15 a.m., at which time the court will set a pretrial schedule.[6]

**ENTER:   May 7, 2015**

                                                                          _____
                                                                          **Robert W. Gettleman**
                                                                          **United States District Judge**

---

[6] Although the court has sustained most of plaintiffs' counts, in preparing a final pretrial order and for trial the court strongly recommends that plaintiffs "streamline" their case by avoiding duplicative claims that arise from the same facts and would not affect potential damages or remedies.